Village of Monroeville, Appellee, *v.* Ward, Appellant.

(No. 70-135—Decided July 14, 1971.)

180

Mr. *Franklin D. Eckstein,* village solicitor, for appellee.

Messrs. *Berkman, Gordon, Kancelbaum & Schwartz* and *Mr. Niki Z. Schwartz,* for appellant.

O'NEILL, C. J. Two questions are presented in this appeal: (1) Whether the 1968 amendment to Section 4 of Article IV of the Ohio Constitution divests the General Assembly of power to provide Courts of Common Pleas with jurisdiction to review judgments of mayors' courts, and (2) whether a mayor, who serves as chief executive officer of a municipality, can function impartially in a judicial capacity.

Prior to its amendment in 1968, Section 4 of Article IV read:

"The jurisdiction of the Courts of Common Pleas, and of the judges thereof, shall be fixed by law."

After its amendment in 1968, Section 4 of Article IV, as it relates to jurisdiction of Courts of Common Pleas, provides:

"(B) The Courts of Common Pleas shall have such original jurisdiction over all justiciable matters and such powers of review of proceedings of administrative officers and agencies as may be provided by law."

At the time these causes were appealed to the Court of Common Pleas, R. C. 1905.22 provided for review of convictions in mayors' courts "* * * in the same manner as appeals on questions of law from a county court * * *" and R. C. 1921.01 provided for judgments of county courts to be appealed to Courts of Common Pleas. In addition R. C. 2953.02 provided for appeals from convictions for violation of ordinances in mayors' courts to the Court of Common Pleas.

In Amended Substitute Senate Bill No. 530, which became effective June 12, 1970, the General Assembly repealed former R. C. 1905.22 and amended R. C. 1921.01 and 2953.02, eliminating from both of those sections appeals to the Courts of Common Pleas from decisions of mayors' courts. In the same bill, the General Assembly enacted a new R. C. 1905.22, which now provides that: "Appeals from a mayor's court may be taken to the Municipal Court or county court having jurisdiction within the municipal corporation."

The initial question here is whether those former statutes providing jurisdiction for a Court of Common Pleas to hear appeals from judgments of mayors' courts, were nullified by the language of Section 4(B) of Article IV, conferring upon Courts of Common Pleas "powers of review of proceedings of administrative officers and agencies as provided by law."

There is no doubt that Section 4(B) does not confer the broad powers earlier conferred upon the General Assembly by former Section 4. In fact, the language of Section 4(B) does not confer upon the General Assembly *any* power to provide Courts of Common Pleas with jurisdiction to decide appeals from mayors' courts,

It must be noted, nonetheless, that mayors' courts still exist (R. C. 1905.01 *et seq.*), and that, at the time these causes were appealed there were statutory provisions for appeals from their judgments to Courts of Common Pleas.

Keeping this in mind, we must examine those statutes and the Constitution to see if they may be reconciled.

Our duty in such cases is expressed in paragraph one of the syllabus in *State, ex rel. Dickman, v. Defenbacher* (1955), 164 Ohio St. 142, as follows:

"An enactment of the General Assembly is presumed to be constitutional, and before a court may declare it unconstitutional it must appear beyond a reasonable doubt that the legislation and constitutional provisions are clearly incompatible."

Application of this principle was discussed in *State, ex rel. Jackman, v. Court of Common Pleas* (1967), 9 Ohio St. 2d 159, 162, wherein the court quoted with approval from *State, ex rel., v. Jones* (1894), 51 Ohio St. 492, 503, 504, as follows:

" 'In determining whether an act of the Legislature is or is not in conflict with the Constitution, it is a settled rule, that the presumption is in favor of the validity of the law. The legislative power of the state is vested in the General Assembly, and *whatever limitation is placed upon the exercise of that plenary grant of power must be found in clear prohibition by the Constitution.* The legislative power will generally be deemed ample to authorize the enactment of a law, unless the legislative discretion has been qualified or restricted by the Constitution in reference to the subject matter in question. If the constitutionality of the law is involved in doubt, that doubt must be resolved in favor of the legislative power. The power to legislate for all the requirements of civil government is the rule, while a restriction upon the exercise of that power in a particular case is the exception.' (Emphasis added.)"

We must therefore examine Article IV to ascertain if any of its provisions authorize the General Assembly to confer jurisdiction upon Courts of Common Pleas for the

purpose of appellate review of judgments of mayors' courts.

Section 1 of Article IV of the Ohio Constitution provides:

"The judicial power of the state is vested in a Supreme Court, Courts of Appeals, Courts of Common Pleas, *and such other courts inferior to the Supreme Court as may from time to time be established by law.*" (Emphasis added.)

Under the above-emphasized portion of Section 1 of Article IV, the General Assembly has the authority to create mayors' courts. In *State, ex rel. Ramey,* v. *Davis* (1929), 119 Ohio St. 596, it was held, in paragraph four of the syllabus, that:

"The power to create a court carries with it the power to define its jurisdiction and to provide for its maintenance." To that proposition, we add that the authority to create courts includes also the authority to provide for appeals from judgments rendered by them.

Considering Sections 1 and 4 of Article IV together, we find that there is no "clear prohibition" in the Constitution preventing the establishment by the General Assembly of provisions for the review of mayors' courts' decisions by Courts of Common Pleas. The language of Section 1 of Article IV is broad enough to support such action despite the wording of Section 4(B) of Article IV. The fact that Section 4(B) specifies that Courts of Common Pleas have "such powers of review of proceedings of administrative officers and agencies as may be provided by law" does not limit the General Assembly's power, under Section 1 of Article IV, to establish courts inferior to the Supreme Court and to make provisions for review in the Courts of Common Pleas of judgments of such statutory courts.

Therefore, we conclude that pursuant to Section 1 of Article IV of the Ohio Constitution, granting the General Assembly the power to establish courts inferior to the Supreme Court, the General Assembly may provide for

review by Courts of Common Pleas of judgments of courts established by statute, notwithstanding the provisions of Section 4(B) of Article IV that Courts of Common Pleas have "such powers of review of proceedings of administrative officers and agencies as may be provided by law."

In reaching this result, we give effect to the rule that statutory provisions should not be adjudged unconstitutional unless "the legislation and constitutional provisions are *clearly incompatible.*" *State, ex rel. Dickman,* v. *Defenbacher, supra* (164 Ohio St. 142).

We now direct attention to the second question presented. The defendant states this issue, as follows:

"A defendant is denied due process of law in violation of the Fourteenth Amendment to the United States Constitution when he is compelled to stand trial before a mayor whose executive responsibilities for revenue production and law enforcement prevent him from acting as a disinterested and impartial judicial officer."

It is defendant's position that, although the decision in *Tumey* v. *Ohio* (1927), 273 U. S. 510, was based on the fact that a mayor, acting in a judicial capacity, could not be disinterested when his income was directly dependent upon conviction of defendants, the court therein pointed out that a mayor also might not be impartial because of his interest as chief executive officer in the finances of his municipality.

The rationale of this argument would disqualify all mayors from serving in a judicial capacity, regardless of the totality of the circumstances in regard to the amount of money provided the municipality by fines and costs levied and collected by the mayor's court.

There is provision in the Ohio statute for the filing of affidavits of prejudice against a mayor acting in a judicial capacity in a specific case where the circumstances in that municipality might warrant a finding of prejudice in that case. R. C. 2937.20.

Defendant quotes the following from *Tumey,* at page 533:

"With his interest, as mayor, in the financial condition of the village * * * might not a defendant with reason say that he feared he could not get a fair trial * * * from one who would have so strong a motive to help his village by conviction and a heavy fine?"

Under R. C. 1905.21, a mayor's salary is fixed by legislative authority and is not dependent on fees or fines collected by the mayor's court.

*Dugan* v. *Ohio* (1928), 277 U. S. 61, held that due process was not violated in circumstances where a mayor's salary was not dependent upon fines collected by the court.

In *Tumey,* the following language appears at page 534:

"It is, of course, so common to vest the mayor of villages with inferior judicial functions that the mere union of the executive power and the judicial power in him can not be said to violate due process of law. The minor penalties usually attaching to the ordinances of a village council * * * do not involve any such addition to the revenue of the village as to justify the fear that the mayor would be influenced in his judicial judgment by that fact."

We are of the opinion that even though the revenue produced from a mayor's court provides a substantial portion of a municipality's funds, such fact does not mean that a mayor's impartiality is so diminished thereby that he cannot act in a disinterested fashion in a judicial capacity. The same may be said in connection with a mayor's interest in law enforcement within the municipality.

All judicial officers are properly interested in maintaining law enforcement, but such interest neither disqualifies them from serving, nor prevents them from being impartial.

The judgments of the Court of Appeals are affirmed.

*Judgments affirmed.*

HERBERT, STERN and LEACH, JJ., concur.
SCHNEIDER, DUNCAN and CORRIGAN, JJ., dissent.

SCHNEIDER, J., dissenting. I would concur in the first paragraph of the syllabus if I were convinced that it was the only way to preserve for review the convictions in mayors' courts occurring subsequent to our decision in *Euclid* v. *Heaton* (1968), 15 Ohio St. 2d 65.

But this is a problem for solution in the first instance by the General Assembly, which has the power to provide for appeals from the mayors' courts to the Courts of Appeals.

Pending action by the legislative branch, the writ of habeas corpus, jurisdiction of which is possessed by all the constitutional courts, is an adequate, if not wholly satisfactory, remedy to review the constitutionality, at least, of those convictions.

I would disregard the label, "Notice of Appeal," and consider the action before the Common Pleas Court as a plea to the exercise of that court's jurisdiction in habeas corpus.

Thus, I cannot agree with Justice Duncan's conclusion. However, I concur with Justice Corrigan's view as expressed in his dissent, that the instant conviction is void.

CORRIGAN, J., concurs in the foregoing dissenting opinion.

DUNCAN, J., dissenting. With the amendment of Section 4(B) of Article IV of the Ohio Constitution, effective May 7, 1968, a significant problem is presented as regards the fate of those provisions of R. C. 1905.22, 2305.01 and 2953.02, which were effective prior to September 16, 1970, and which pre-existed the amendment and authorized an appeal to a Court of Common Pleas from a judgment or final order of a mayor's court. This question has been acute, resulting in conflicting court decisions in similar cases. See *Monroeville* v. *Ward* (1969), 21 Ohio App. 2d 17; *Stone* v. *Goolsby* (1969), 18 Ohio Misc. 105; *Village of Commer-*

*cial Point* v. *Branson*, 20 Ohio Misc. 66; *State* v. *Foster* (1969), 20 Ohio Misc. 257.

It has long been the law of this state that jurisdiction is the power to hear and determine a cause. *Sheldon's Lessee* v. *Newton* (1854), 3 Ohio St. 494, paragraph one of the syllabus; *Loftus* v. *Pennsylvania Rd. Co.* (1923), 107 Ohio St. 352, 356. Before jurisdiction exists it ·must be found, *inter alia,* that the law has given the tribunal sub· ject-matter jurisdiction, or the capacity to hear the con· troversy in question. *Sheldon's Lessee. supra,* paragraph two of the syllabus. The limits and exercise of subject-mat· ter jurisdiction are controlled by the Ohio Constitution and the statutes of the state. *Thompson* v. *Redington* (1915), 92 Ohio St. 101, paragraph one of the syllabus. See *Humphrys* v. *Putnam,* 172 Ohio St. 456, at 460; *State, ex rel Finley,* v. *Pfeiffer* (1955), 163 Ohio St. 149, 153. *Cf. Loftus* v. *Pennsylvania Rd. Co., supra.*

With these principles in mind, I would decide that Section 4(B) of Article IV of the Ohio Constitution does not permit a Court of Common Pleas to hear appeals from a mayor's court. Whereas the Constitution, previous to May 7, 1968, provided for the jurisdiction of Courts of Common Pleas to be fixed by law, the amendment, effective May 7, 1968, provides: "The Courts of Common Pleas shall have such original jurisdiction over all justiciable matters and such power of review of proceedings of administrative officers and agencies as may be provided by law." The subject-matter grant of power is two-fold: (1) Original jurisdiction and (2) review of proceedings of administrative officers and agencies.

In passing on the constitutionality of a statute, the basic concepts are that a statute is presumed to be constitutional, and unconstitutionality must be found beyond a reasonable doubt (*State, ex rel. Dickman,* v. *Defenbacher* [1955], 164 Ohio St. 142, paragraph one of the syllabus), and that the Ohio Constitution is a power-limiting rather than a power-granting instrument (*McNab* v. *Board of Park*

*Commrs.* [1923], 108 Ohio St. 497, 501). Equally appreciated is the observation that when the electors amend the Constitution it is presumed that some change was intended. Attention to those salient touchstones of constitutional interpretation regulates the climate in which this inquiry is to be conducted.

I believe that Section 4(B) of Article IV of the Ohio Constitution, effective May 7, 1968, limits the power of the General Assembly to grant judicial review by the Common Pleas Courts to the proceedings of administrative officers and agencies. Such is, in fact, the expressed limitation. Interpreting the amendment otherwise would result in the General Assembly still having complete power to "provide for the jurisdiction of the Courts of Common Pleas," a proposition obviously abandoned by the vote of the electors.

At the same election, Section 3(B)(2) of Article IV of the Ohio Constitution was adopted, effective May 7, 1968. It reads:

"Courts of Appeals shall have such jurisdiction as may be provided by law to review and affirm, modify, or reverse judgments or final orders of the courts of record inferior to the Court of Appeals within the district and shall have such appellate jurisdiction as may be provided by law to review and affirm, modify, or reverse final orders or actions of administrative officers or agencies."

Although the doctrine of *expressio unius est exclusio alterius* is available in constitutional interpretation, it is not needed here inasmuch as the amendments specifically allocate judicial power to these components of the court system.

Therefore, R. C. 1905.22, 2305.01 and 2953.02, as in effect prior to September 16, 1970, were unconstitutional to the extent that they go beyond constitutional limits and grant Courts of Common Pleas jurisdiction to hear appeals from mayors' courts.

I would hold that the Court of Common Pleas had no appellate jurisdiction to hear the appeal.

CORRIGAN, J., dissenting. Once again we are presented herein with a poser of pre-eminent significance and constitutional magnitude.

It is precisely stated in appellant's brief, Proposition of Law No. 2, as follows:

"A defendant is denied due process of law in violation of the Fourteenth Amendment to the United States Constitution when he is compelled to stand trial before a mayor whose executive responsibilities for revenue production and law enforcement prevent him from acting as a disinterested and impartial judicial officer."

Appellant was charged by chief of police Conners of the Monroeville Police Department, first, with violating Ord. No. 47-12, Section 2 of the ordinances of that village for failing to comply with a lawful order of a police officer to stop and submit to a safety check and, secondly, with failing to produce a driver's license on the request of the police officer at the same time. Appellant was convicted and fined on each charge in the mayor's court of the village of Monroeville. Appeal was taken to the Court of Common Pleas where the judgments were affirmed and were consolidated in an appeal to the Court of Appeals for Huron County, which also affirmed the judgments.

The record shows that the appellant was flagged down at a truck check-point set up in Monroeville by an agent of the Public Utilities Commission of Ohio for the purpose of checking trucks on a state highway (Route 20) for defects, illegal loads and anything that would arise. The commission has no authority to make an arrest, but its agent, if he finds a violation, does the checking and files an affidavit, referring the result to the policeman of the village, who makes the arrest under a village ordinance. It is the policy of the commission to encourage certain villages to pass ordinances to help the commission. Such checks are made in Monroeville, which has passed this type of ordinance.

The record establishes that a substantial portion of the general fund of the unchartered village of Monroeville

was derived from fines and costs levied by the mayor in the mayor's court as follows:

| Year | Fine Revenue | Total General Fund Revenue |
|------|--------------|----------------------------|
| 1964 | $23,589.50 | $46,355.38 |
| 1965 | 18,508.95 | 46,752.60 |
| 1966 | 16,085.00 | 43,585.13 |
| 1967 | 20,060.65 | 53,931.43 |
| 1968 | 23,439.42 | 52,995.95 |

The record reflects further that the maintenance of this sizeable revenue from fines and costs to the village was of such importance that an ordinance was enacted hiring a management consultant firm to study the threat to its revenue posed by the 1959 County Court Law reducing the jurisdiction of mayors' courts.[1]

[1] Ordinance No. 59-9:

"WHEREAS, the legislation known as the County Court law passed by the 102nd General Assembly greatly reduces the jurisdictional powers of Mayor Courts as of January 1, 1960; and

"WHEREAS, such restrictions may place such a hardship upon law enforcement personnel in this village and surrounding areas as to endanger the health, welfare and safety of persons residing or being in our village; and

"WHEREAS, other such provisions of this legislation may cause such a reduction in revenue to this village that an additional burden may result from increased taxation and/or curtailment of services essential to the health, welfare and safety of this village; . . .

"BE IT ORDAINED BY THE VILLAGE OF [MONROEVILLE] OHIO:

"Section 1: That the services of the management consulting firm of Midwest Consultants, Incorporated of Sandusky, Ohio, be employed to conduct a survey and study to ascertain the extent of the effects of the County Court Law on law enforcement and loss of revenue in and to the Village of [Monroeville], Ohio, so that said Village can prepare for the future operations of the Village to safeguard the heath [sic], welfare and safety of its citizens * * *."

The executive power of villages is vested in the mayor. He is the chief conservator of the peace therein. He is also the president of the legislative authority and presides at all regular and special meetings thereof with authority to vote if there is a tie. The mayor is responsible for seeing that all ordinances of the municipality are obeyed and enforced.

He must give periodic account to the legislative authority (council) of the financial condition of the municipality. The mayor fills vacancies in any municipal department. It is his duty to supervise the conduct of all the officers of the municipal corporation, inquire into and examine the grounds of all reasonable complaints against any of such officers, and cause their violations or neglect of duty to be promptly punished or reported to the proper authority for correction.

All fines, forfeitures and costs in ordinance cases and all fees collected by the mayor are paid by him into the municipal treasury on the first Monday of each month.

In a mayor's court, established by virtue of R. C. Chapter 1905, the mayor has jurisdiction to hear and determine any prosecution for the violation of an ordinance of the municipal corporation, and has jurisdiction in all criminal causes involving moving traffic violations occurring on state highways located within the boundaries of the municipal corporation. The mayor, presiding at any trial, may punish for contempts, compel the attendance of jurors and witnesses, and establish rules for the examination and trial of all cases brought before him, in the same manner as judges of county courts.

So the mayor in this case actually possesses executive, legislative and judicial power.

As aptly pointed out in appellant's brief:

"The scrupulous concern in American jurisprudence for the impartiality of its judges has its origins in two much venerated principles of government.

"The maxim that no man ought to be a judge in his own cause (*Nemo debit esse judex in propria causa.*') was

rigidly applied at common law.[2] Indeed, some courts went so far as to disqualify a judge merely because he was an inhabitant of the town which would receive part of the fine should the accused be convicted. See e. g. *Pearce* v. *Atwood*, 13 Mass. 324 (1816).[3]

"The second principle generating concern for the avoidance of conflicts of interest on the part of the judiciary was the doctrine of separation of powers, by which the framers of the Constitution endeavored to protect individual liberty by the distribution of power among the several branches of government. Thus, Alexander Hamilton declared in No. 78 of the Federalist Papers:

" '. . . the general liberty of the people can never be endangered from [the judiciary]; I mean so long as the judiciary remains truly distinct from both the legislative and the executive. For I agree that "there is no liberty if the power of judging be not separated from the legislative and executive powers"."[4]

"The principle of separation of powers was carried forth into the Ohio Constitution,[5] and recognized by Ohio courts as applicable to municipal corporations. Thus, in *Porter* v. *City of Oberlin*, 1 Ohio St. 2d 143 (1965), this court struck down a portion of the Oberlin fair housing law on the ground that it permitted a legislative commission to exercise judicial and/or executive powers. As long

---

[2]"The most celebrated application of this doctrine took place in *Bonham's Case* (K. B. 1610), 8 Coke 118a, 77 Eng. Rep. 646. See also *Rex* v. *Great Chart*, Burr. S. C. 194, Stra. 1173, where it was said, ' "And by the common law, if an order of removal were made by two justices, and one of them was an inhabitant of the parish from which the pauper was removed, such order was illegal and bad, on the ground that the justice who was an inhabitant was interested as being liable to the poor's rate." ' (Quoting from Hawkins, 2 *Pleas of the Crown*)."

[3]"Although this extreme position was rejected in Ohio, *Thomas* v. *Town of Mt. Vernon* (1839), 9 Ohio 290, the fact that the question posed a serious issue is indicative of the depth of commitment to the impartiality of the magistrate."

[4]"Quoting from Montesquieu, Spirit of Laws, Vol. 1, page 181."

[5]"See Articles II, III and IV distributing the power of the state among legislative, executive and judicial branches respectively."

ago as 1928, the Hamilton County Common Pleas Court declared:

" 'Mayors, and for that matter, any other officials, have no right to have and exercise both executive and judicial powers at the same time. Such a situation violates the fundamental principle of American government, to-wit, that of the separation of the departments of government, and in the judgment of the court, a mayor having been created as an executive officer, he is to be given executive powers only, and that it is a denial of due process of law for one to be forced to trial before him involving his liberty or property.' *In re von Uehn*, 27 Ohio N. P. (N. S.) 167, 172.

"This long standing commitment of our legal system to an impartial and disinterested judiciary is violated when the judge is a mayor who has executive responsibilities for the raising and expenditure of revenue, for the enforcement of the laws, for the conservation of the peace, and for the appointment and supervision of the police force. * * *"

In this case, too, in connection with the mayor's executive responsibilities, there must necessarily be a grave concern on his part for the financial condition of the village. The question then might occur to the outside observer: Is this a salutary climate for evenhanded justice where fines and costs imposed in the mayor's court represent a percentage of total revenue to the general fund of the village of over one-third to one-half during the five-year period, 1963-1968?

Then, there is also the fact that the mayor, as executive officer, appoints the chief of police and police officers of the village, and as a judge he evaluates their credibility as against opposing witnesses.

Too, the mayor, as president of the council, has a part in setting the salaries of these police officers.

Are these official interests as parts of the mayor's various capacities so minuscule, so trifling, so remote or so insignificant that his sitting as a judge in a case in the mayor's court may not contribute to a great fear on a

194

defendant's part that he will not be fully accorded the due process of law to which he is entitled?

The city replies in the negative, and cites *Tumey* v. *Ohio* (1927), 273 U. S. 510, and *Dugan* v. *Ohio* (1928), 277 U. S. 61, in support of its position. *Tumey* differs from our factual situation in that the mayor received certain fees and costs in the amount of $12 for acting in a judicial capacity in the case. The direct pecuniary interest of the mayor in that case was held to be a denial of due process to the defendant. In *Dugan*, the charter city of Xenia had a commission form of government and the mayor was a member of the commission of five. A city manager was the executive and the mayor exercised only judicial functions. That case, too, differs from our factual situation.

It is with profound mindfulness of the unrest with laws and the enforcement of laws in our country today that I reemphasize the importance of public confidence in the impartiality of all courts. It seems to this member of the court that this confidence, which we strive to merit in the judiciary, may be easily eroded with a mayor's court of this type. This observation is not to be considered in any way as a reflection on the integrity or capacity of the mayor who presided as judicial officer at this trial. But I am fearful that a defendant brought into a mayor's court may, with reason and persuasion, rightly complain that he was not likely to get a fair trial or a fair sentence from a judge who, as chief executive, is responsible for the financial condition of the village and who has the chief of police and other police officers under his supervision; who passes on the latters' credibility in trials before him; who levies fines which total in some years up to half of the revenue income of the village; who is not an attorney.

As the Supreme Court said in *Tumey*, at page 532: "* * * Every procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the state and the accused denies the latter due process of law."

It is equally important that there must not only be justice, but there must also be the appearance of justice, as was emphasized by this court and also by the United States Supreme Court in the following cases:

"It is of vital importance that the litigant should believe that he will have a fair trial." *State, ex rel. Turner, v. Marshall* (1931), 123 Ohio St. 586.

"* * * Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way 'justice must satisfy the appearance of justice.' *Offutt v. United States*, 348 U. S. 11, 14." *In re Murchison* (1955), 349 U. S. 133, 136.

My conclusion is that these convictions should be reversed for the reason that, under the facts reflected by this record, the defendant was not given the benefit of his constitutional right to due process of law.