The State, ex rel. Brockman, *v.* Proctor, Mayor.

[Cite as State, ex rel. Brockman, v. Proctor (1973),
35 Ohio St. 2d 79.]

(No. 72-857—Decided July 3, 1973.)

*Messrs. Beers & Colegrove* and *Mr. Donald F. Colegrove*, for relator.

*Mr. Robert T. McConaughy*, city solicitor, for respondent.

O'NEILL, C. J.   The relator seeks a writ of prohibition to prevent the mayor of Blue Ash from exercising his judicial jurisdiction to conduct the trial of relator who is charged with several traffic offenses.   The facts are stipulated and the parties agree as to the single question of law presented.

The only issue to be determined by this court is: In a charter city, where a defendant is compelled to stand trial before the mayor who has no executive power or duties, but who is a voting member of the city council which determines the appropriations and expenditures of revenue derived from fines, bond forfeitures and court costs assessed by the mayor, is the defendant denied due process of law under the provisions of the Fourteenth Amendment to the United States Constitution?

The relator asserts that he is denied due process under the Fourteenth Amendment, and cites in support of his contention *Ward* v. *Monroeville* (1972), 409 U. S. 57; *Tumey* v. *Ohio* (1927), 273 U. S. 510, 533; and *Dugan* v. *Ohio* (1928), 277 U. S. 61.   The respondent, who agrees as to the question of law presented, relies upon the same cases.

The writ is denied on authority of *Dugan* v. *Ohio, supra*, and *Monroeville, supra*, which approved *Dugan*.

The issue in the instant case was decided by this court in *Dugan* v. *State* (1927), 117 Ohio St. 503, which decision was affirmed by the United States Supreme Court in *Dugan* v. *Ohio, supra* (277 U. S. 61), in an opinion written by Chief Justice Taft.   That decision was announced 14 months after

*Tumey* v. *Ohio, supra* (273 U. S. 510), which opinion was also written by Chief Justice Taft. The decision in *Dugan* v. *Ohio, supra*, was discussed and approved in *Ward* v. *Monroeville* (1972), 409 U. S. 57.

The facts in the instant case are on all fours with the facts in *Dugan* v. *Ohio*. Chief Justice Taft, in *Dugan* v. *Ohio, supra*, at page 64, distinguishes that case from *Tumey* v. *Ohio*.

Mr. Justice Brennan, in *Ward* v. *Monroeville, supra*, at page 60, distinguished *Dugan* from *Monroeville*, and approved *Dugan*, as follows:

"*This situation [Monroeville] is wholly unlike that in Dugan v. Ohio, 277 U. S. 61 (1928), which the Ohio Supreme Court deemed controlling here. There the Mayor of Xenia, Ohio, had judicial functions but only very limited executive authority. The city was governed by a commission of five members, including the mayor, which exercised all legislative powers. A city manager, together with the commission, exercised all executive powers. In those circumstances, this court held that the mayor's relation to the finances and financial policy of the city was too remote to warrant a presumption of bias toward conviction in prosecutions before him as judge.*" (Emphasis added.)

When applied to the instant case, *Dugan*, and *Monroeville* in reaffirming *Dugan*, are exactly in point and controlling as to the single issue raised by the relator in his complaint and in his brief. The writ must be denied unless this court chooses to extend the scope of the Fourteenth Amendment to the United States Constitution beyond the limits set by the United States Supreme Court in *Monroeville, supra*, in approving *Dugan, supra*.

R. C. 1905.01 establishes a mayor's court "in all municipal corporations not having a police court and not being the site of a municipal court."[1]

Section 1 of Article IV of the Ohio Constitution empowers the General Assembly to establish mayors' courts and vests judicial power in such courts. That section provides, in pertinent part:

---

[1]For exceptions see R. C. 1905.01 and 1901.021.

"The judicial power of the state is vested in * * * such other courts inferior to the Supreme Court as may from time to time be established by law."

The accepted rule is: An enactment of the General Assembly is presumed to be constitutional, and before a court may declare it unconstitutional it must appear beyond a reasonable doubt that the legislation and the constitutional provisions are clearly incompatible. *State, ex rel. Dickman,* v. *Defenbacher* (1955), 164 Ohio St. 142, 128 N. E. 2d 59.

There is nothing in the record from which it may be inferred that the mayor, as judge, has any, direct or indirect, personal or official substantial pecuniary interest in reaching a conclusion against relator.

The record indicates that the relation of respondent, as one of the seven members of the city council, to the fund contributed to by his fines as judge, or to the executive or financial policy of the city is too remote to warrant a presumption of bias toward conviction in prosecutions before him as judge.

If the court were to declare all criminal trials in mayors' courts unconstitutional there is nothing this court could do to provide another court to handle the volume of cases now handled daily by mayors' courts. Further, upon the record in the instant case, if this court were to reach out to declare all mayors' courts' jurisdiction to try criminal cases unconstitutional it would be an unwarranted invasion of the power vested in the General Assembly by the Constitution.

The distinction between *Tumey* and *Monroeville* on the one hand, and *Dugan* and the instant case on the other, is clear. *Tumey* and *Monroeville* involve municipalities in which the mayor had broad *executive powers and responsibilities,* while *Dugan* and the instant case involve municipalities in which the mayor has *no executive power or responsibility,* but only the *legislative power* that a single member of a municipal council or commission holds.

The facts in the instant case are similar to the facts in

*Dugan, supra.* In *Dugan,* the Supreme Court of the United States found no violation of due process.

This court exercises judicial restraint in the instant case in permitting the General Assembly to properly resolve the problems created by the decision of the United States Supreme Court in *Monroeville.*

The writ is denied.

*Writ denied.*

HERBERT, STERN and W. BROWN, JJ., concur.
CORRIGAN, CELEBREZZE and P. BROWN, JJ., dissent.

CORRIGAN, J., dissenting. I am obligated, by what appears to me to be the constitutionally sound result to achieve under the simple facts in this case, to dissent from the decision of the majority.

This conclusion would necessitate the disapproval and overruling of *Dugan* v. *State* (1927), 117 Ohio St. 503.

It is my belief, after weighing the applicable legal doctrines, that in the trial, in a mayor's court, of a defendant for the violation of a municipal ordinance or of a traffic offender, the mayor's impartiality may be affected where monies, collected from fines and costs levied upon defendants by the mayor in his court, are paid by the mayor into the general operating fund of the city; and that fact alone is sufficient to disqualify him as a judicial officer (presiding over the mayor's court of the city), irrespective of the extent to which he participates in the management of the financial affairs of the municipality and the percentage of municipal revenue which is derived from such mayor's court. And further, the fact that a municipality receives *any* revenue directly as a result of proceedings (court trials, pleas of guilty or pleas of no contest) for violations of municipal ordinances and criminal causes involving moving traffic violations occurring on state highways located within the boundaries of the municipal corporation, conducted by a judicial officer who is also the may-

or of the municipality, taints the entire judicial proceeding and denies to a defendant his right to a "remedy by due course of law," as provided in Section 16, Article I of the Ohio Constitution. However, this view would not foreclose service by a mayor in a ministerial capacity, as provided in Rule .18 of the Uniform Traffic Rules.

Relator propounds one proposition of law, as follows:

"A defendant is denied due process of law in violation of the Fourteenth Amendment to the United States Constitution when he is compelled to stand trial before a mayor who is a voting member of a small city council which determines the appropriation and expenditures of revenue derived from fines, bond forfeitures and court costs assessed by the mayor."

It is relator's position that this cause is governed by the decision in *Ward* v. *Monroeville* (1972), 409 U. S. 57. In that case, the mayor had wide executive powers, was president of the village council, presided at council meetings, voted in cases of a tie, accounted to the council respecting village finances, filled vacancies in village offices, had general supervision of village affairs and a "* * * major part of village income * * * [was] derived from the fines, forfeitures, costs and fees imposed by him in his mayor's court." (409 U. S. 58.)

Upon those facts, in paragraph two of the syllabus in *Monroeville* v. *Ward* (1971), 27 Ohio St. 2d 179, the majority of this court held in a four-to-three decision:

"The facts that revenues produced from a mayor's court provide a substantial portion of a municipality's funds, and that a mayor who serves as judicial officer of a mayor's court is also the chief executive officer of the municipality, do not necessarily prevent such mayor from being impartial when acting in a judicial capacity."

The Supreme Court of the United States, reversing that majority judgment of this court, held that trial before such a mayor denied the defendant a trial before a disinterested and impartial judicial officer as guaranteed by the due process clause of the Fourteenth Amendment.

In the course of the opinion, Mr. Justice Brennan stated:

"* * * Although 'the mere union of the executive power and the judicial power in him can not be said to violate due process of law,' *id.*, at 534 [*Tumey* v. *Ohio*, 273 U. S. 510], the test is whether the mayor's situation is one 'which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the state and the accused . . .' *Id.*, at 532. Plainly that 'possible temptation' may also exist when the mayor's executive responsibilities for village finances may make him partisan to maintain the high level of contribution from the mayor's court. This, too, is a 'situation in which an official perforce occupies two practically and seriously inconsistent positions, one partisan and the other judicial, [and] necessarily involves a lack of due process of law in the trial of the defendants charged with crimes before him.' *Id.*, at 534."

Respondent contends that the facts, as set out in the stipulation of facts stated in the majority opinion, are sufficient to distinguish this cause from *Ward* v. *Monroeville*; that "* * * there is no denial of due process under either the Ohio Constitution or the United States Constitution in compelling a defendant to stand trial before a mayor whose only connection with municipal appropriations and expenditures is being one of seven members of the municipal legislature * * *."

Mayors' courts are provided for in this state by R. C. 1905.01, which reads, in part:

"In all municipal corporations not having a police court and not being the site of a municipal court nor a place where Portage County Municipal Court sits as required pursuant to Section 1901.021 of the Revised Code or by designation of the judges pursuant to Section 1901.021 of the Revised Code, the mayor of such municipal corporation has jurisdiction to hear and determine any prosecution for the violation of an ordinance of the municipal corporation,

and has jurisdiction in all criminal causes involving moving traffic violations occurring on state highways located within the boundaries of the municipal corporation, subject to the limitations of Sections 2937.08 and 2938.04 of the Revised Code.''

The effect of that section is that a person, by virtue of his election to the office of mayor in the instances described, becomes a judicial officer. As such, he must decide litigated criminal questions according to law. He is not required to be a lawyer or even to be legally trained.[2] Yet, under R. C. 1905.28, the mayor presiding at any trial may punish contempts, compel the attendance of jurors and witnesses, and establish rules for the examination and trial of all cases brought before him in the same manner as judges of county courts. Such provisions of law, imposed on a nonlawyer serving as a judicial officer in a mayor's court, it seems to me, make a mockery of constitutional due process. What professional, specialized legal knowledge would such an untrained person have to make rules for trials brought before him?

According to the provisions of R. C. 1905.30, when a fine is the whole or part of a sentence, a nonlawyer presiding in a mayor's court may order the person sentenced to remain confined in the county jail, workhouse, or prison of the municipal corporation, until the fine and costs are paid, or secured to be paid, or the offender is legally discharged.

When a fine which is imposed by the mayor for the violation of an ordinance of a municipal corporation is not paid, the party convicted shall, under R. C. 1905.34, by order of the mayor of the municipal corporation, or on process issued for the purpose, be committed until such fine and costs of prosecution are paid, or until the party convicted is legally discharged. ''Committed'' means imprisoned.

By virtue of R. C. 1905.35, imprisonment under the ordinances of a municipal corporation shall be in the work-

---

[2]The respondent, Charles Proctor, Mayor of the city of Blue Ash, is not admitted to practice law in the state of Ohio according to the records in the office of the Clerk of the Supreme Court of Ohio.

house or other jail of the municipal corporation. Any municipal corporation not provided with a workhouse or other jail may, for the purpose of imprisonment, use the county jail, at the expense of the municipal corporation, until the municipal corporation is provided with a prison, house of correction, or workhouse.

It is anachronistic and incredible that such archaic, fusty provisions feign to shield our citizens' sacred and valuable constitutional rights. At best, they promise feeble safeguards for due-process and equal-protection rights. Such judicial officers could not be expected to possess expertise on legal matters.

In a mayor's court, the city or village may not be legally represented by a person other than a lawyer, and the defendant, if he is represented, must likewise have the legal services of a member of the bar. Any other representation would constitute unauthorized practice of law. *Yet the mayor, who presides as judge in such court, is not required to be a member of the bar, to have any training in the law, or to have any educational qualifications whatsoever.*

In this rocket age of constitutional law, the mayor's court is one of the few remaining vestiges of barnyard justice from the horse and cart era. The continuation of approval of such courts, presided over by nonlawyers, degrades the administration of justice and weakens certain constitutional guarantees. This, I refuse to countenance.

All other judicial officers of the state are required by statute to be admitted to the practice of law in this state (County Court, R. C. 1907.051; Municipal Court, R. C. 1901.06; Common Pleas Court, R. C. 2301.01; Court of Appeals, R. C. 2501.02; Supreme Court, R. C. 2503.01).

It has been suggested lamentably that it would be anomalous for this court to take the position that a person filling the role of judge in a mayor's court should properly be a lawyer inasmuch as there is no statutory or constitutional provision in the United States Constitution requiring that the Chief Justice or a Justice of the United States

Supreme Court be a lawyer. For appointment to the United States Supreme Court, even to the Chief Justiceship, no qualifications are imposed by the United States Constitution, neither as to age, nor as to citizenship, nor as to residence in the United States; let alone that the prospective justice be a lawyer. Not only does the Constitution neglect to specify the qualifications of the Chief Justice of the United States, it does not even expressly provide that there shall be one. The only reference in the Constitution to a Chief Justice is found in the section dealing with impeachments, where it is stated that when the Senate is conducting the trial in an impeachment of the President, the Chief Justice is to preside (presumably, because the regular presiding officer, the Vice President, would not be disinterested inasmuch as he would succeed to the Presidency if the President were found guilty).

However, since February 1, 1790, when the first convening of the United States Supreme Court was held under Chief Justice John Jay, who was the first appointment to the court by President Washington, down through 105 Chief Justices and Justices to the present day, there has never been an appointment to that court of a person who was not a lawyer. To deviate from this rule would be the frightful anomaly. And, the reason is perfectly obvious; the business of a court of law is the business of lawyers, whether it be the United States Supreme Court or the mayor's court of the city of Blue Ash, so that the constitutional and statutory rights of citizens, which are being litigated in those courts, are professionally and properly protected.

Section 5(A)(1), Article IV of the Ohio Constitution, provides:

"In addition to all other powers vested by this article in the Supreme Court, *the Supreme Court shall have general superintendence over all courts in the state.* Such general superintending power shall be exercised by the Chief Justice in accordance with rules promulgated by the Supreme Court." (Emphasis added.)

This court, by Section 5(A)(1), Article IV, is thus vested with authority to superintend mayors' courts. In fact, this court has made provision for superintendence over mayors' courts in its Rules of Practice and Procedure in Traffic Cases for all Courts Inferior to Common Pleas (Uniform Traffic Rules).

Rule .05 of those rules reads:

"The Canons of Judicial Ethics as adopted by the Supreme Court of Ohio shall apply to the judge of each court subject to these rules, whether or not such judge has been admitted to the bar. The provisions of Canons 25, 28 and 30 shall not apply to mayors' courts. It shall be the obligation of each such judge to conduct his court and his professional and personal relationships in accordance with the same standards as are required of judges of courts of record."

It is apparent at this point that mayors who serve as judicial officers occupy an anomalous position. Although they are not designated as judges in R. C. 1905.01, they are so characterized in Uniform Traffic Rule .05. However, inasmuch as "judges" of mayors' courts are not required to be admitted to the practice of law, they are not subject to this court's Rules for the Government of the Bar of Ohio, which include rules for the disciplining of lawyers (Rule V), and for the removal of judges (Rule VI). Thus, the authority which this court has under Section 5(A)(1) to superintend "all courts in the state" has significantly less impact upon mayors' courts than other courts in the state.

In *Ward* v. *Monroeville, supra* (409 U. S. 57), as noted above, the court quoted from *Tumey* v. *Ohio* (1927), 273 U. S. 510, that "the mere union of the executive power and the judicial power in * * * [a mayor] can not be said to violate due process of the law." The court proceeded nonetheless to hold that, in the trial of the defendant in the mayor's court of Monroeville, he was denied his right to trial before a disinterested and impartial judicial officer because on the facts presented and described above—the mayor was responsible for village finances and monies

collected in his court provided a substantial portion of village funds— applying the *Tumey* test, the mayor's situation was one "which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the state and the accused * * *."

The difficulty in applying *Ward* v. *Monroeville* to a given case lies in determining where the line is to be drawn in deciding when a mayor's involvement in municipal government and its finances and municipal revenue collected from the mayor's court is sufficiently extensive to make it impossible for the mayor to function as a disinterested and impartial judicial officer.

It appears to me that, once the principle is recognized that *a mayor's impartiality may be affected by the fact that monies collected in his court go into the general operating fund of the municipality, that fact alone is sufficient to disqualify him as a judicial officer presiding over the mayor's court,* irrespective of the extent to which he participates in the management of the financial affairs of the municipality and the percentage of municipal revenue which is derived from his court.

It is appropriate to note here that Section 6(B), Article IV of the Ohio Constitution, provides that: "* * * Judges shall receive no fees or perquisites, nor hold any other office of profit or trust, under the authority of this state, or of the United States." This section assures that judges of the state may not be placed in a position where conflicting interests may affect their judgment.

In my opinion, mayors likewise should not be placed in such a position where they might be tempted "not to hold the balance nice, clear and true between the state and the accused." The fact that the municipality receives *any* revenue as a result of proceedings (court trials, pleas of guilty or pleas of no contest) for violations of municipal ordinances and criminal causes involving moving traffic violations occurring on state highways located within the

boundaries of the municipal corporation, conducted by a judicial officer who is also the mayor of the municipality, taints the entire judicial proceeding and denies to a defendant his right to a "remedy by due course of law," as provided in Section 16, Article I of the Ohio Constitution.[3]

The American Bar Association Commission on Standards of Judicial Administration, in 1973, published a tentative draft on standards relating to Court Organization. It is noteworthy, in connection with this minority opinion concerning mayors' courts in Ohio, what the view of the commission is on the subject of revenues from fines. They suggest in proposed standard 1.53:

"Revenues from Fines: The purpose of fines and other exactions imposed through judicial proceedings is to enforce the law and not to provide financial support for the courts or other agencies of government. All revenues from fees, fines, penalties and forfeitures levied by a court should be transferred to the state general fund, and should not be appropriated to the court receiving them or by a local unit of government that supports such a court."

In the Commentary, it is stated:

"The use of courts as revenue producing agencies is a continuing abuse of the judicial process. It has long been recognized as unconstitutional for a judge to have his income dependent on the outcome of cases before him, but a similar result often occurs indirectly when the budget of the court in which he sits is established with reference in whole or in part to the fine revenues produced by the court. This is at present a common practice in courts of limited jurisdiction. It should be eliminated. See *Ward* v. *Village of Monroeville*, 93 S. Ct. 80 (1972), *Tumey* v. *Ohio*, 273 U. S. 510 (1927)."

---

[3]By holding that trial of alleged traffic offenders in mayors' courts violates Section 16, Article I of the Ohio Constitution, does not foreclose service by a mayor in a ministerial capacity in a traffic case to accept "appearance, waiver of trial, plea of guilty and payment of fine and/or costs" as provided in Rule .18 of the Uniform Traffic Rules.

To all of which we fervently intone the ancient Hebrew interjection, "Amen."

Similar constitutional infirmities exist in R. C. 705.-14, providing for certain members of the municipal legislative authority to act as police justices, with mayor's court authority; and likewise R. C. 705.55, authorizing each member of council in certain municipalities operating under the city manager plan to perform all judicial functions of a mayor.

Adoption of the Modern Courts Amendment in 1968, pursuant to which the judicial article of our state Constitution was amended to provide the Supreme Court with powers of superintendence over all courts in the state, stands as an expression on the part of the electorate that the judicial system in Ohio be so structured as to provide for the fair administration of justice for all. Mayors' courts, as presently provided for in R. C. 1905.01, do not measure up to the standard required for that fair administration of justice.

An essential attribute of the judicial process is "* * * that the litigant should believe that he will have a fair trial." *State, ex rel. Turner,* v. *Marshall* (1931), 123 Ohio St. 586.

"* * * Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way 'justice must satisfy the appearance of justice.' *Offutt* v. *United States,* 348 U. S. 11, 14." *In re Murchison* (1955), 349 U. S. 133, 136.

For the above reasons, the writ of prohibition should be allowed.

P. Brown, J., concurs in the foregoing dissenting opinion.