MENTOR–ON–THE–LAKE, Appellee,

v.

GIFFIN, Appellant.

[Cite as *Mentor-on-the-Lake v. Giffin* (1995), 105 Ohio App.3d 441.]

Court of Appeals of Ohio,
Eleventh District, Lake County.

No. 94–L–120.

Decided July 25, 1995.

*Joseph M. Gurley,* City Law Director, for appellee.

*Neil R. Wilson,* for appellant.

Ford, Presiding Judge.

On July 8, 1994, after a two-day trial, the jury found appellant, Eva Giffin, guilty of driving under the influence of alcohol. She was fined $300 and commanded to enter an alcohol rehabilitation facility for seventy-two hours. Her driver's license was suspended for six months, and she was also ordered to attend DUI school and a driver awareness program. From this sentence she perfected this appeal.

On March 18, 1994, appellant was stopped by Mentor-on-the Lake Patrolman Evangelista at approximately 12:30 a.m. He had witnessed her vehicle leave from a local tavern, make a wide turn and drive over the berm. As the vehicle approached him, he observed the car weaving in a steady pattern and crossing over the center double yellow line into the opposite lane of travel. He then followed her automobile and continued to see the car weave across the yellow line a few more times. He activated his lights, but the vehicle continued driving for an additional three-quarters of a mile before stopping.

The officer got out of his cruiser, and as he approached the automobile, he saw that the driver was slouched behind the wheel. When he spoke with her, he noticed that appellant had bloodshot eyes, a flushed face, and smelled of alcohol. She was asked to get out of the vehicle and perform three field sobriety tests, all of which she failed. She was placed under arrest and transported to the police station where she was twice asked to submit to a Breathalyzer test. She declined both times.[1]

She then contacted a co-worker, who telephoned the mayor. He apparently called the police department, and after some discussion, appellant was released. She was not charged that evening. Subsequently, the arresting officer issued appellant two citations for driving under the influence of alcohol and failure to exercise reasonable control of her vehicle.

A two-day jury trial ensued, and appellant was convicted of driving under the influence of alcohol. The second charge was dismissed with appellant agreeing to pay the court costs. She timely perfected this appeal, claiming the following as error:

"1. The trial court erred to the prejudice of defendant/appellant in making statements in the presence of the jury which denied the defendant a fair trial.

"2. The trial court erred to the prejudice of defendant/appellant in excusing a juror during the trial without cause.

---

1. Appellant denied that she refused to take the Breathalyzer test, but claimed that she wanted to speak with an attorney before submitting to the Breathalyzer.

"3. The trial court erred in instructing the jury that they could consider the defendant/appellant's refusal to submit to a breathalyzer test as some evidence that she was under the influence of alcohol."

During the course of the trial, the judge made a multitude of comments which appellant claims were prejudicial. Specifically, she refers this court to a number of instances where the trial court made statements during the questioning of certain witnesses.

Officer Evangelista was examined concerning his testimony about appellant's appearance, including her bloodshot eyes. The following colloquy occurred during cross-examination:

"Q: Well, in your training and background, did you learn about these things?

"MR. GURLEY: Objection.

"THE COURT: I don't know, but you know, the jurors, they are just as smart as the rest of us and they know about the fact that there may be many factors that will give you a flushed face once in a while. So, you know, I don't know, understand why we are going through with this. Let's get on to the stuff that's really important. You can make those points when you argue to the jury. If they are not quick enough to pick up on it, you can make sure they pick up on it when you argue the case."

Later, the officer was asked, "If you were in a smoky room, you would too [have red eyes]?" The officer answered, "Yeah." At that point, the court interjected, "And if you were under the influence of alcohol, they would too; right? (Inaudible)."

Appellant later called an acquaintance and co-worker, Jeri Krotz, to testify:

"Q. You talked to Zadd, you needed help. Why did you need help?

"A. Because I don't—

"MR. GURLEY: Objection.

"THE COURT: Well, she needed help. Let's hear what the help was. She seemed to be at home safe and sound, so—but, at any rate, how did you need help?

"THE WITNESS: I didn't know what to do. I didn't know—I didn't know if I could call City Hall, I didn't know if I needed money, I didn't know—I knew I had to—to help somehow, I had to help her.

"THE COURT: Oh, so what you are really trying to tell everybody here is that you found out that Eva was in trouble with Mentor-on-the-Lake Police Department or at the police department and that somehow or other you wanted to see if you could get her out of there; is that a fair statement?

"THE WITNESS: Well, fair, but not totally—

"THE COURT: So, therefore, you had just seen the Mayor and you were in the political game and so you wanted to go that route; no?

"THE WITNESS: No, Your Honor. You are correct, I did see Mayor Crocker at the funeral home, which probably brought him to mind, but I also grew up—

"THE COURT: (Inaudible) yeah, you had seen him many times before.

"THE WITNESS: Correct, I've known him probably fifteen, twenty years.

"THE COURT: As a matter of fact, he's associated with the Lake County Sheriff's Department and any [sic] of the officers of Lake County certainly know John Crocker because he is not only the Mayor of City of Mentor-on-the-Lake, but he also happens to work down there, right, or not?

"THE WITNESS: Yes, I'm sure I've seen him on occasion down there.

"THE COURT: And, as a matter of fact, just about everybody that's been in here so far happens to be political animals and, therefore, attend political functions and, therefore, knows that Mr. Crocker goes to these political functions; wouldn't that be a fair statement?

"THE WITNESS: Yes, but not—had nothing to do with why I called Mr. Crocker.

"THE COURT: Oh, all right, so why did you call Mr. Crocker?"

Counsel for appellant continued questioning the witness: "Q. What did you say to Mr. Crocker?" At that point, the court offered its own answer to the question: "I need help." However the witness responded: "No, no, I did not. I said 'What can I do?' * * *"

During further questioning of Krotz, the following exchange transpired:

"Q. Well, in any case, he called back. What did you say to him? Obviously, he said something to you. What did you say to him?

"A. Thank you.

"Q. And—

"THE COURT: And, then she drove over to the Mentor-on-the-Lake Police Station. Let's not make hard work out of this thing. It's pretty simple."

Additionally, the court again interrupted the questioning of Jeri Krotz by raising and subsequently sustaining its own objection:

"Q. Do you recall what you said, if anything?

"A. We primarily discussed that since they have towed her car, her garage door opener is in her car—

"THE COURT: What does all this have to do with the charge?

"MR. GARGIULO: Your Honor, may we approach the bench on this issue?

"(Whereupon, the following proceedings were held at side bar.)

"MR. GARGIULO: The issue is concerned with her speech.

"THE COURT: (Inaudible.) Why are we going into this stuff?

"(Whereupon, the following proceedings were held in open court.)

"THE COURT: *The Court's objection is sustained.*" (Emphasis added.)

The examination of witness Bonnie Beckwith included the following:

"Q. How did you become friends?

"A. It's only happened to me maybe two or three times in my life, but when I met Eva, there was an immediate rapport developed between us. There was a— a very common—

"THE COURT: I just want to hear how you became friends and apparently you like her, so you—

"THE WITNESS: Right.

"THE COURT: —started going to the same bars as she went to?

"THE WITNESS: No.

"THE COURT: Oh, okay. Let's not make more out of this than what should be made out of this."

Finally, appellant noted one other instance which she claims demonstrated the trial court's involvement during the direct examination of defense witness Beckwith:

"MR. GURLEY: May it please the Court, we will stipulate that this witness loves this Defendant like a sister.

"MR. GARGIULO: Well, thank you for that.

"THE COURT: That still doesn't answer the question. You ask your question and let's get the answer."

█ In response to appellant's claims, appellee wishes to suggest that the court's actions did not display favoritism, since "other Trial Court comments with Officer Evangelista on the stand could arguably be construed as depicting an anti-prosecutorial posture." The prosecution then directs this court's attention to a number of instances where the trial court undertook active participation in the matter by terminating direct examination of Patrolman Evangelista, telling the witness to "quit rambling," and displaying "impatience" and "frustration" with the

police officer during his testimony. However, such judicial conduct, whether directed at one party or all parties, is not to be condoned.

The traditional rule in Ohio is that the party seeking to challenge the court's questioning of a witness is required to raise an objection with the trial court. Specifically, Evid.R. 614 provides:

"(C) *Objections.* Objections to the calling of witnesses by the court or to interrogation by it may be made at the time or at the next available opportunity when the jury is not present."

In *State v. Davis* (1992), 79 Ohio App.3d 450, 455, 607 N.E.2d 543, 546, the court explained the basis for the rule:

"The provision relating to objections is designed to relieve counsel of the embarrassment attendant upon objecting to questions by the judge in the presence of the jury, while at the same time, assuring that objections are made in ample time to afford the opportunity to take possible corrective measures. See Advisory Committee Note to analogous Fed.R.Evid. 614. The failure of a party to object in accordance with Evid.R. 614(C) waives consideration of the claimed error on appeal because the failure to object deprives the trial court of any opportunity to correct the alleged error."

However, in *State v. Prokos* (1993), 91 Ohio App.3d 39, 44, 631 N.E.2d 684, 687, the court noted:

"Under Evid.R. 611, the court has discretion to control the flow of the trial. This control includes asking questions of the participants and the witnesses in the search for truth. Evid.R. 614. Since a trial court's powers pursuant to Evid.R. 611 and 614 are within its discretion, a court reviewing a trial court's interrogation of witnesses and comments must determine whether the trial court abused its discretion. *State v. Davis* * * *."

An abuse of discretion has been defined as a trial court's attitude that is unreasonable, arbitrary or unconscionable. *State v. Montgomery* (1991), 61 Ohio St.3d 410, 413, 575 N.E.2d 167, 170.

Furthermore, when the matter is tried before a jury, the judge must exercise greater restraint. In *State v. Perkins* (1947), 130 W.Va. 708, 715–716, 45 S.E.2d 17, 20–21, the Supreme Court of West Virginia held:

"In disposing of a similar question presented in the case of *State v. Hurst* [ (1877) ], 11 W.Va. 54, this Court laid down the following rule: 'It is error for a court in the trial of a criminal cause, to make a remark to, or in the presence of the jury, in reference to matters of fact, which might in any degree influence

them in their verdict.' In the case of *State v. Thompson* [ (1882) ], 21 W.Va. 741, 756, this Court again adverted to the rule laid down in the *Hurst* case.

"The rule is amplified and restated in the seventh point of the syllabus in the case of *State v. Austin* [ (1923) ], 93 W.Va. 704, 117 S.E. 607, as follows: 'In the trial of a criminal case, the jurors, not the court, are the triers of the facts, and the court should be extremely cautious not to intimate in any manner, by word, tone, or demeanor, his opinion upon any fact in issue.' In the case of *State v. Hively* [ (1927) ], 103 W.Va. 237, 136 S.E. 862, this court held: 'Under the practice in this State, the trial judge should express to the jury no opinion on the testimony, either directly or by innuendo.' "

██ This similar rule has been adopted in Ohio:

"In a trial before a jury, the court's participation by questioning or comment must be scrupulously limited, lest the court, consciously or unconsciously, indicate to the jury its opinion on the evidence or on the credibility of a witness.

"In a jury trial, where the intensity, tenor, range and persistence of the court's interrogation of a witness can reasonably indicate to the jury the court's opinion as to the credibility of the witness or the weight to be given his testimony, the interrogation is prejudicially erroneous." *State ex rel. Wise v. Chand* (1970), 21 Ohio St.2d 113, 50 O.O.2d 322, 256 N.E.2d 613, paragraphs three and four of the syllabus.

From our review of the record, we are able to discern an attitude reflecting disdain for this particular proceeding. Such demeanor and tenor lead to a prejudicial effect upon the trial and reflect poorly upon the judicial process.

 This court recently discussed a trial court's duty to maintain an appearance of impartiality in *State v. Bayer* (Mar. 24, 1995), Geauga App. No. 94–G–1853, unreported, 1995 WL 237094. This court noted:

"[T]he judiciary must not only remain detached and neutral in any proceeding before it, but the court must also epitomize itself as the paragon of impartiality.

" ' "It is of vital importance that the litigant should *believe* that he will have a fair trial." *State, ex rel. Turner, v. Marshall* (1931), 123 Ohio St. 586, 176 N.E. 454."

 " ' "* * * Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way *justice must satisfy the appearance of justice.'* *Offutt v. United States,* [1954], 348 U.S. 11, 14 [75 S.Ct. 11, 13, 99 L.Ed. 11, 16]." *In re Murchison* (1955), 349 U.S. 133, 136 [75 S.Ct. 623, 625, 99 L.Ed.2d 942, ——].' (Emphasis added.)

*Monroeville v. Ward* (1971), 27 Ohio St.2d 179, 195 [56 O.O.2d 110, 118–119, 271 N.E.2d 757, 766] (Corrigan, J., dissenting)."

In the instant action, we are troubled by the court's commentary during the questioning of witnesses. While we recognize that *Davis* indicated that a timely objection was a prerequisite to preserving the issue on appeal, the degree of the court's involvement is extensive. Furthermore, the court's involvement exceeded merely questioning the witnesses as some of the court's remarks could have been interpreted by the jury to reflect the court's attitude or opinion of the witness and the proponent's testimony.

Appellee claims that since the court issued a curative instruction, any improper comments were rendered harmless. During the course of the charge to the jury, the trial the court instructed:

"If during the course of trial I have said or done anything that you consider an indication of my viewpoints on these facts, you are hereby instructed to disregard it."

However, we are not convinced that this curative instruction was sufficient to cleanse the jurors' minds of the remarks made by the trial court so as to cure any judicial impropriety. The first assignment is sustained.

In the second assignment, appellant claims that the court improperly dismissed a juror from the jury panel. However, as the second assignment of error is rendered moot by our resolution of the first assignment, we need not, and do not choose to address the merits of the claimed error. App.R. 12.

In the third assignment of error, appellant claims that the court erred by instructing the jury that it could consider appellant's refusal to submit to the Breathalyzer. Prior to closing arguments the court indicated that it would be issuing the standard jury instructions and inquired whether counsel had any "special instruction." Appellant's attorney responded, "No special ones, but I want to go over with the court about a specific one." However, the record does not contain any further discussions regarding the jury instructions, and appellant did not raise any further objection before or after the charge to the instruction now being challenged. As such, she has waived this issue. Civ.R. 51(A).

Independently, we do not perceive any error with the court's decision to provide the jury with this instruction. Specifically the trial court advised:

"There has been some evidence introduced indicating that [appellant] was asked, but refused, to submit to a chemical test of her breath to determine the amount of alcohol in her system. This was for the purpose of suggesting that [appellant] believed that she was under the influence of alcohol.

"If you find that [appellant] refused to submit to the test, you may, but you are not required to considered [*sic* ] all this evidence, along with all the other facts and circumstances in evidence, in deciding whether or not [appellant] was under the influence of alcohol."

Such a charge is appropriate when the record contains some evidence of this fact. Indeed, the Supreme Court of Ohio, in *Maumee v. Anistik* (1994), 69 Ohio St.3d 339, 632 N.E.2d 497, approved the instruction offered by the court in the instant action. The third assignment is overruled.

For the foregoing reasons, the judgment of the trial court is reversed, and the cause is remanded for a new trial.

*Judgment reversed*
*and cause remanded.*

CHRISTLEY and JOSEPH E. MAHONEY, JJ., concur.