James ROSE, et al., Plaintiffs,

v.

**VILLAGE OF PENINSULA,**
et al., Defendant.

No. 5:93–CV–001.

United States District Court,
N.D. Ohio,
Eastern Division.

Jan. 27, 1995.

See also 839 F.Supp. 517.

Augustin F. O'Neil, Melissa Graham–Hurd, Akron, OH, for James H. Rose, Michael G. Becker.

Mark H. Ludwig, Leland D. Cole, Cole Co., Akron, OH, Alan E. Johnson, Leo R. Ward, Ward & Associates, Cleveland, OH, for Village of Peninsula, E.G. Ruoff, Eric L. Redmon.

## OPINION & ORDER

O'MALLEY, District Judge.

Currently pending in this action are the following motions: (1) motion by all defendants for summary judgment on all counts (docket no. 49); (2) motion by defendants Ruoff and Redmon for summary judgment on counts III and IV, based on qualified immunity (docket no. 50); (3) motion by all defendants for summary judgment on all claims brought by plaintiff Becker based on Becker's execution of a release (docket no. 51); and (4) motion by all plaintiffs for summary judgment on Counts I and II (docket no. 58). For the reasons set forth below, the Court rules on these motions as follows:

(1) the motion by all defendants for summary judgment on all counts (docket no. 49) is DENIED as to Counts I, II, and III, and is GRANTED as to Count IV;

(2) the motion by defendants Ruoff and Redmon for summary judgment on counts III and IV based on qualified immunity (docket no. 50) is GRANTED as to defendant Redmon and DENIED as to defendant Ruoff;

(3) the motion by all defendants for summary judgment on all claims brought by plaintiff Becker based on Becker's having signed a release (docket no. 51) is GRANTED; and

(4) the motion by plaintiff Rose for summary judgment on Counts I and II (docket no. 58) is GRANTED.

**The parties are directed to appear for a status conference at 3:00 p.m., February 13, 1995, to discuss scheduling of further proceedings necessary in this case.**

### I.

Except where noted, the following facts are not in dispute.

#### A. Facts Related to Plaintiff Rose.

On July 9, 1991, plaintiff Rose was driving his automobile eastbound on State Route 303 when he was stopped by Officer Redmon. Based on a radar reading, Officer Redmon cited Rose for going 52 m.p.h. in a section posted 35 m.p.h. During his stop of Rose,

Officer Redmon learned that Rose had an expired driver's license. Therefore, Officer Redmon gave Rose an additional citation for driving with an expired license. Both citations came with a summons requiring Rose to appear in the Village of Peninsula Mayor's Court.

Rose first obtained a continuance and then appeared *pro se* on August 14, 1991. Following a plea of not guilty, Rose's case went to trial in the Mayor's Court before Mayor Ruoff. Mayor Ruoff is the Mayor and Chief Executive Officer of the Village of Peninsula, and is responsible for the financial condition of the Village. He is also the chief conservator of the peace and is the person responsible for hiring Officer Redmon. Mayor Ruoff found Rose guilty of both offenses and imposed a $25 fine and $32 in court costs.

Rose retained counsel and, on August 20, 1991, appealed his convictions to the Cuyahoga Falls Municipal Court. On September 12, Rose's counsel filed a motion to dismiss. On September 23, 1991, the Village dismissed the charges against Rose, thereby terminating the case. The Village did not obtain any *quid pro quo* in exchange for dismissing the charges against Rose.

Rose alleges, and the defendants do not dispute, that the 35 m.p.h. speed limit signs on State Route 303 were improperly posted. According to Ohio law, the speed limit along the stretch of highway where Rose was stopped was 50 m.p.h. This speed limit may be changed for reasons of safety, if authorized by the Ohio Department of Transportation ("ODOT").[1] Some or all of the defendants, however, replaced these speed limit signs with 35 m.p.h. signs, without first obtaining the required authorization from ODOT. The speed limit signs were changed in October of 1990.

Rose alleges that the defendants took this action not for reasons of safety, but specifically and only for the purpose of increasing Village revenues. Rose also alleges that Mayor Ruoff advised the Village police to charge people with violations of Village ordinances, rather than violations of state law, so that the Village could collect any fees or fines. Rose has submitted evidence for the purpose of showing that the defendants were motivated to take these actions because the Village was having financial problems. The defendants deny these allegations, except that they do not seriously dispute that the Village does have financial problems or that the Mayor and other Village officials had expressed concern about those problems.

*B. Facts Related to Plaintiff Becker.*

Becker's circumstances are very similar to those of Rose, with one important difference. On February 9, 1992, Becker was traveling westbound on State Route 303 when a Village police officer (who is not a defendant) stopped him for speeding. Based on a radar reading, the officer cited Becker for travelling 56 m.p.h. in a section posted 35 m.p.h. Becker's citation and summons directed him to appear in the Mayor's Court on February 12, 1992. Becker appeared *pro se* and entered a plea of not guilty, and his case was continued to April 1, 1992. Becker's case was then tried by Mayor Ruoff, who found Becker guilty and imposed a $20 fine and $34 in court costs.

Like Rose, Becker also retained counsel and appealed his conviction to the Cuyahoga Falls Municipal Court. Becker's counsel also filed a motion to dismiss. At a hearing that Becker attended with counsel on May 13, 1992, the Municipal Court dismissed the case against Becker without ruling on the merits of the motion to dismiss. Unlike Rose, however, in order to secure the dismissal of his case, Becker signed a form releasing the defendants from liability.

II.

Based on these facts, the plaintiffs bring the following claims. Counts I and II allege that both Rose and Becker were denied the right to due process of law because Mayor Ruoff served simultaneously as both the Chief Executive Officer of the Village of Peninsula and also as judge in the Village's mayor's court. Plaintiffs claim that because Mayor Ruoff was concurrently vested with both executive and judicial powers, he was

---

1. *See* Ohio Rev.Code § 4511.21(B)(6), (I), and (J).

not and could not be a disinterested and impartial judge.

In Count III, Rose alleges that Mayor Ruoff, Officer Redmon, and the Village of Peninsula conspired to stop him pursuant to a traffic ordinance that they knew was invalid and improper. Rose asserts that the defendants' conspiracy resulted in the deprivation of his fundamental liberty right to be free from physical restraint. Count IV is an adjunct to Count III: Rose claims that Officer Redmon seized him without reasonable suspicion or probable cause.

In Count V, Rose and Becker ask the Court to declare Ohio Rev.Code § 2945.72(F) unconstitutional. This code section sets the period of time within which misdemeanor defendants must be brought to trial. The Court has previously dismissed Count VI, in which Rose essentially claimed that he should have been allowed to represent people in the Village Mayor's Court, even though he is not an attorney, because Mayor Ruoff is not an attorney.

It should be noted that Becker and Rose are plaintiffs in Counts I, II, and V; Rose is the sole plaintiff in Counts III, IV, and VI.

### III.

The standard that the Court must apply to all of the above motions is the same. Federal Rule of Civil Procedure 56(c) governs summary judgment motions and provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law ...

■ Rule 56(e) specifies the materials properly submitted in connection with a motion for summary judgment:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein ... The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denial of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

However, the movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

■ In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *White v. Turfway Park Racing Assn., Inc.,* 909 F.2d 941, 943–44 (6th Cir.1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252, 106 S.Ct. at 2512.

### IV.

■ The Court first addresses the motion by all defendants for summary judgment on all claims brought by plaintiff Becker (docket no. 51). In this motion, defendants point out that Becker, in exchange for dismissal of his

traffic citation, executed an agreement releasing the defendants from liability arising from his traffic stop. The release agreement states, *inter alia:*

> ... I, MICHAEL BECKER, after careful deliberation and advice of counsel, do hereby release from any and all claims for myself, and for my heirs, the Village of Peninsula, Peninsula Police Department Officer(s), and any other law enforcement officer of the village of Peninsula arising from my stop and citation of February 9, 1992, in exchange for the dismissal, without prejudice, of the traffic offense.
>
> I understand that by signing this Release, I effectively waive my constitutional rights and or civil rights (42 U.S.C. § 1983) to bring an action against the Village of Peninsula, Peninsula Police Department, and the citing officer.

Becker's attorney also signed this release.

Beyond presenting a copy of Becker's release, defendants cite facts which show convincingly that Becker's execution of his release was voluntary, that there was no prosecutorial overreaching, and that enforcement of the release will not adversely affect relevant public interests. These facts support defendants' argument that they have met the burden of asserting the release as a valid defense to Becker's claims. *See Town of Newton v. Rumery,* 480 U.S. 386, 107 S.Ct. 1187, 94 L.Ed.2d 405 (1987); *Hill v. City of Cleveland,* 12 F.3d 575 (6th Cir.1993).

Becker has not filed any written memorandum opposing defendants' motion for summary judgment on the grounds of release. At oral argument, however, when asked by the Court if Becker opposed defendants' motion on the grounds of release, plaintiffs' counsel answered affirmatively and cited for the first time *Coughlen v. Coots,* 5 F.3d 970 (6th Cir.1993), and *Lynch v. City of Alhambra,* 880 F.2d 1122 (9th Cir.1989).

*Coughlen* and *Lynch* affirm "that it is the burden of those relying upon [a release as a defense] to establish that the [release] agreement is neither involuntary nor the product of an abuse of the criminal process." *Rumery,* 480 U.S. at 399, 107 S.Ct. at 1195

(O'Connor, J., concurring in part and in the judgment). The *Coughlen* and *Lynch* courts remanded their cases to the respective district courts for explicit findings of whether the defendants in those cases had met their burden. These cases do not stand for the proposition, however, that a Court must overrule a motion for summary judgment when, as in this case, the *only* evidence presented to the Court shows that the execution of the release in question was completely voluntary, there is no indicia of any prosecutorial overreaching, and enforcement of the release cannot be said to adversely affect any relevant public interest.

This Court agrees that defendants bear the burden of proof on the issue of whether Becker's release bars his present claims. The Court concludes that defendants have satisfied that burden, and that Becker has offered nothing to rebut defendants' showing. Accordingly, because there is no genuine issue of material fact regarding the legal effect of Becker's release, the defendants' motion for summary judgment on all claims brought by plaintiff Becker (docket no. 51) is GRANTED.

## V.

At this point, it is useful to take inventory of the claims remaining in this case. As noted above, Becker and Rose joined as plaintiffs in Counts I, II, and V of the complaint, while Rose is the sole plaintiff in Counts III, IV, and VI. This Court previously dismissed Count VI, and also dismissed the claims for monetary damages made in Count I against defendant Ruoff. Order at 27 (Dec. 1, 1994) (docket no. 40). Because the Court has granted summary judgment to defendants on Becker's claims, the only remaining claims in this case are Rose's claims made in Counts I through V.

Furthermore, upon inquiry by the Court at oral argument, plaintiffs stated that they did not oppose defendants' motion for summary judgment as to Count V.[2] Accordingly, defendants' motion for summary judgment on Count V of the complaint is GRANTED as unopposed. The Court now turns to the

**2.** In their written memoranda, plaintiffs were

silent on their position regarding Count V.

remaining motions as they apply to Rose's claims made in Counts I through IV.

## VI.

In their motion for summary judgment on all counts (docket no. 49), defendants move for judgment on Counts I, II, III and IV as a matter of law. In plaintiffs' motion for partial summary judgment and brief in opposition (docket no. 58), plaintiffs respond that as to Counts III and IV, summary judgment cannot be granted because genuine disputes of material fact exist. As to Counts I and II, plaintiffs "agree with defendants that there are no genuine issues of material fact," but insist that it is they who are entitled to summary judgment. Brief at 1. The Court addresses these cross-motions for summary judgment below.

### A. Counts I and II

■ Counts I and II allege that Rose was denied the right to due process of law because defendant Ruoff impermissibly "wears two hats": not only is Ruoff the Mayor and Chief Executive Officer of the Village of Peninsula, with responsibility for the village's financial condition, but Ruoff also acts as judge in the village's mayor's court, where he heard and decided Rose's contested traffic case. Rose contends that this procedure was flawed because there was not an adequate separation of powers—Ruoff's executive responsibility for the village's financial condition taints his judicial responsibility to decide dispassionately whether to impose monetary penalties for traffic violations. Essentially, plaintiffs complain that, as a matter of law, Mayor Ruoff cannot be a disinterested and impartial judge.

An analysis of Rose's claims must begin with the three cases decided by the United States Supreme Court that have examined the question of whether Ohio's mayor's courts provide sufficient due process. In *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927), Tumey was convicted in mayor's court for possession of intoxicating liquor—then a violation of the Ohio Prohibition Act—and fined $100, including court costs. The Ohio Prohibition Act provided that half of the fines produced from convic-

tions went to the state and half to the village where the mayor's court was located. The village in question in *Tumey,* North College Hill, had passed an ordinance providing that the mayor "shall [personally] receive or retain the amount of his costs in each case, in addition to his regular salary, as compensation for hearing such cases." *Tumey,* 273 U.S. at 519, 47 S.Ct. at 439. The end result of these laws was that the mayor-judge who found Tumey guilty of violating the Ohio Prohibition Act actually had a direct and personal stake in the outcome of Tumey's case: the mayor personally collected court costs of $12.00 that he would not have received had Tumey been acquitted. *Id.* at 522, 531, 47 S.Ct. at 440–41, 444.

In reversing Tumey's conviction, the *Tumey* Court noted that "[t]he mayor is the chief executive of the village. He supervises all the other executive officers. He is charged with the business of looking after the finances of the village.... With his interest, as mayor, in the financial condition of the village, and his responsibility therefor, ... a defendant [might] with reason say that he feared he could not get a fair trial or a fair sentence from one who would have so strong a motive to help his village by conviction and a heavy fine." *Id.* at 533, 47 S.Ct. at 444–45. Thus, the court overturned Tumey's conviction because "[a] situation in which one perforce occupies two practically and seriously inconsistent positions, one partisan and the other judicial, necessarily involves a lack of due process of law in the trial of defendants charged with crimes before him." *Id.* at 534, 47 S.Ct. at 445.

Despite its holding, the *Tumey* Court did not ban Ohio's mayor's courts, completely. The Court stated:

It is, of course, so common to vest the mayor of villages with inferior judicial functions that the mere union of the executive power and the judicial power in him cannot be said to violate due process of law. The minor penalties usually attaching to the ordinances of a village council, or to the misdemeanors in which the mayor may pronounce final judgment without a jury, do not involve such addition to the revenue of the village as to justify the fear

that the mayor would be influenced in his judicial judgment by that fact. *Id.* at 534, 47 S.Ct. at 445. However, the Court did not provide any guidelines as to what level of additional village revenue might reasonably disqualify a mayor-judge, because "[t]he difference between such a case and the plan and operation of the statutes before us is so plain as not to call for further elaboration."

*Id.*

Shortly after *Tumey* was decided, the Supreme Court revisited the issue of due process in Ohio's mayor's courts. The plaintiff in *Dugan v. Ohio,* 277 U.S. 61, 48 S.Ct. 439, 72 L.Ed. 784 (1928), also contested his conviction in mayor's court for a violation of the Ohio Prohibition Act. Unlike the North College Hill village mayor in *Tumey,* however, the Xenia city mayor in *Dugan* did not have exclusive executive power. Xenia had a five-member commission which exercised executive power through a city manager. As one of the five members of the commission, the Xenia mayor's relation "to the fund contributed to by his fines as judge, or to the executive or financial policy of the city, [was] remote," *id.* at 65, 48 S.Ct. at 440, to the point where "the mayor ha[d] no executive, and exercise[d] only judicial, functions." *Id.* at 63, 48 S.Ct. at 439. The Xenia city mayor in *Dugan* was further distinct from the village mayor in *Tumey* in that the Xenia mayor received "a salary which is not dependent on whether he convicts in any case or not." *Id.* at 65, 48 S.Ct. at 440. Given these factual distinctions, the Supreme Court decided that the Xenia mayor was not "wearing two hats," and declined to overturn Dugan's conviction for lack of due process of law.

Finally, the Supreme Court examined the due process implications of Ohio's mayor's courts in *Ward v. Village of Monroeville,* 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972). In *Ward,* the plaintiff challenged two $50 fines imposed by a village mayor for contested traffic violations. The Supreme Court reversed the plaintiff's convictions and fines, reasoning as follows:

> The Mayor of Monroeville has wide executive powers and is the chief conservator of the peace. He is president of the village council, presides at all meetings, votes in case of a tie, accounts annually to the council respecting village finances, fills vacancies in village offices and has general overall supervision of village affairs. A major part of village income is derived from the fines, forfeitures, costs, and fees imposed by him in his mayor's court. Thus, in 1964 this income contributed $23,589.50 of total village revenues of $46,355.38; in 1965 it was $18,508.95 of $46,752.60; in 1966 it was $16,085 of $43,585.13; in 1967 it was $20,060.65 of $53,931.43; and in 1968 it was $23,439.42 of $52,995.95.

> Conceding that "the revenue produced from a mayor's court provides a substantial portion of a municipality's funds," the Supreme court of Ohio held nonetheless that "such fact does not mean that a mayor's impartiality is so diminished thereby that he cannot act in a disinterested fashion in a judicial capacity." ... We disagree with that conclusion.

*Ward,* 409 U.S. at 58–59, 93 S.Ct. at 82.

The Supreme Court then clarified its holdings in *Dugan* and *Tumey,* emphasizing that it was not whether the mayor personally shared in the profits of the mayor's court that dictated the different results in those cases:

> The fact that the mayor [in *Tumey* ] shared directly in the fees and costs did not define the limits of the principle. Although "the mere union of the executive power and the judicial power in him can not be said to violate due process of law," *id.,* [273] at 534 [47 S.Ct. at 445] the test is whether the mayor's situation is one "which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused...." *Id.,* at 532 [47 S.Ct. at 444]. Plainly that "possible temptation" may also exist when the mayor's executive responsibilities for village finances may make him partisan to maintain the high level of contribution from the mayor's court. This, too, is a "situation in which an official perforce oc-

cupies two practically and seriously inconsistent positions, one partisan and the other judicial, [and] necessarily involves a lack of due process of law in the trial of defendants charged with crimes before him." *Id.,* at 534 [47 S.Ct. at 445]. *Ward,* 409 U.S. at 60, 93 S.Ct. at 83.[3] In sum, even though the village mayor in *Ward* had no direct pecuniary interest in convictions, the Court overturned Ward's conviction because the mayor's duties as both mayor and judge were "seriously and practically inconsistent."

The parties in this case strongly disagree on how the law as set out in *Tumey, Dugan,* and *Ward* applies to the facts in this case. After reviewing the parties' memoranda of law and hearing the parties at oral argument, the Court's attention has been focused upon two especially salient facts. First, defendant Ruoff, as mayor of the Village of Peninsula, shares the same level of executive authority as the mayor of Monroeville in *Ward.* Like the mayor of Monroeville, Mayor Ruoff "has wide executive powers and is the chief conservator of the peace. He is president of the village council, presides at all meetings, votes in case of a tie, accounts annually to the council respecting village finances, fills vacancies in village offices and has general overall supervision of village affairs." *Ward,* 409 U.S. at 58, 93 S.Ct. at 82. The Ohio statutes that today delineate the expanse of Mayor Ruoff's executive authority are the same statutes as those that defined the village mayor's authority in *Ward. See generally* Ohio Revised Code §§ 733.23, 733.24, 733.30, 733.31–.35, 733.41, 737.15, and 737.16 (describing various aspects of a village mayor's executive authority). Mayor Ruoff's executive authority is not diluted, as was the mayor's executive authority in *Dugan.*

Second, it is as true in this case as in *Ward* that "[a] major part of village income is derived from the fines, forfeitures, costs, and fees imposed [in the] mayor's court." *Ward,* 409 U.S. at 58, 93 S.Ct. at 82. That this is so may be seen through simple comparison. In his dissenting opinion in *Village of Monroeville v. Ward,* 27 Ohio St.2d 179, 56 O.O.2d 110, 271 N.E.2d 757 (1971), Justice Corrigan set out the following chart:

| Year | Fine Revenue | Total General Fund Revenue | Fines As Percentage Of General Fund |
|---|---|---|---|
| 1964 | $23,589.50 | $46,355.80 | 50.9% |
| 1965 | 18,508.95 | 46,752.60 | 39.6 |
| 1966 | 16,085.00 | 43,585.13 | 36.9 |
| 1967 | 20,060.65 | 53,931.43 | 37.2 |
| 1968 | 23,439.42 | 52,995.95 | 44.2 |

*Id.* at 190, 56 O.O.2d 110, 271 N.E.2d 757 (the last column of this chart has been added by this Court). The United States Supreme Court recited these same numbers as evidence that "a major part of village income is derived" from fees imposed by the mayor's court. *Ward,* 409 U.S. at 58, 93 S.Ct. at 82. In the instant case, an analogous chart looks like this:

| Year | Fine Revenue | Total General Fund Revenue | Fines As Percentage Of General Fund |
|---|---|---|---|
| 1990 | $49,560.00 | $402,236.00 | 12.3% |
| 1991 | 65,627.20 | 558,378.00 | 11.8 |
| 1992 | 72,549.51 | 521,099.00 | 13.9 |

(Figures taken from affidavits of Jean E. Wurzbacher and Polly Rutledge, attached to defendants' brief in opposition to motion for preliminary injunction (docket no. 20)).

Admittedly, these charts show that the percentage of the general fund made up by fine revenue from the mayor's court is lower

**3.** It is notable that the Court's opinion in *Ward* borrowed significantly from Ohio Supreme Court Justice Corrigan's dissent in *Village of Monroe-* *ville v. Ward,* 27 Ohio St.2d 179, 56 O.O.2d 110, 271 N.E.2d 757 (1971).

in this case than in *Ward.* But it is manifest that an annual collection of funds in excess of $50,000, and which amount to over 10% of the Village of Peninsula's general fund, are "substantial" and make up "a major part of village income," just as was the case in *Ward.*

Defendants attempt to statistically distinguish this case from *Ward* on three grounds. First, defendants note that of the $187,736.71 in fine revenue produced by the mayor's court in 1990, 1991, and 1992, only $3,400.00 was derived from *contested* cases. Defendants thus claim that less than 0.25% of the Village of Peninsula's general fund comes from cases where the mayor may have exercised impartiality. Defendants argue that this amount is too small to "possibly tempt the average man as a judge to forget the burden of proof." *Ward,* 409 U.S. at 60, 93 S.Ct. at 82.

This is a trenchant argument.[4] However, the facts cited by defendants do not take this case out of the ambit of *Ward:* doubtless, only a similarly low percentage of the cases heard in the Village of Monroeville mayor's court were contested. The *Ward* Court examined *all* fine revenue generated by the mayor's court when it determined substantiality, not just the fine revenue generated in contested cases. This Court is constrained by the *Ward* court's analysis and must do the same.[5]

Second, defendants present figures showing that "nearly 20% of those tried [by Mayor Ruoff] were found not guilty," and argue that this acquittal rate precludes any contention that the fees collected in Mayor Ruoff's court show impartiality. Defendants' brief at 14. This argument must also fail. The *Ward* court did not examine the mayor's acquittal rate; it examined the substantiality of the fines that the mayor's court collected.

The mayor's acquittal rate in *Ward* may also have been high, but it was the amount of fund revenue collected by the mayor's court that supplied "a defendant with reason [to] say that he feared he could not get a fair trial or a fair sentence." *Tumey,* 273 U.S. at 533, 47 S.Ct. at 445. The Court also notes that Mayor Ruoff's successor may not be as lenient.

Third, defendants point out that the percentage of the general fund comprised of mayor's court fine revenues is markedly lower in this case than in *Ward.* As noted above, while defendants' observation is true, the Court still finds as a matter of law that the fine revenues in this case are "substantial" both in absolute amount and as a percentage of total general fund revenues. Certainly, any person suddenly deprived of 10% or more of his income would find the loss "substantial." In sum, defendants' arguments that the fine revenues collected by the mayor's court in this case are not substantial are not persuasive.

At oral argument, some attention was given to the question of where, in the context of this case, the line between "substantial" and "not substantial" should be drawn. The Court recognizes that, because it finds as a matter of law that the fine revenue produced by the Village of Peninsula's mayor's court is "substantial," Ohio's villages may be forced to wonder at what amount or percentage such revenue *becomes* substantial. This Court is unwilling, and has not been asked, to set out any bright line rule; however, it deserves mention that the Supreme Court of Ohio has stated *generally* that "the revenue produced from a mayor's court provides a substantial portion of a municipality's funds." *Ward,* 27 Ohio St.2d at 185, 56 O.O.2d 110, 271 N.E.2d 757.[6]

---

4. Lending at least some force to defendants' argument is the Supreme Court's suggestion that a mayor's participation in non-contested cases, where the mayor is acting more in a ministerial than a judicial capacity, might call for a different due process analysis. *Ward,* 409 U.S. at 62 n. 2, 93 S.Ct. at 84 n. 2.

5. Also, it must be noted that some of the defendants in Mayor Ruoff's court who chose not to contest the charges brought against them may have, like plaintiffs here, questioned Mayor

Ruoff's impartiality, and simply chose not to wage what they feared or assumed would be a vain contest.

6. The Supreme Court of Ohio, however, has been somewhat inconsistent on this question. In *State ex rel. Brockman v. Proctor,* 35 Ohio St.2d 79, 64 O.O.2d 50, 298 N.E.2d 532 (1973), the court completely ignored substantiality as a measure of the constitutionality of the mayor's court, simply holding that "[t]he trial of a defendant charged with a traffic offense by a mayor acting as judge,

■ More important, whether a defendant convicted in a contested case in an Ohio village mayor's court has been denied due process of law does not simply depend on whether the fee revenue produced by that mayor's court is "substantial." While substantiality is clearly an important factor in the analysis, the thrust of the inquiry is whether the mayor "occupies two practically and seriously inconsistent positions, one partisan and the other judicial." *Ward,* 409 U.S. at 60, 93 S.Ct. at 83 (quoting *Tumey,* 273 U.S. at 534, 47 S.Ct. at 445). The court's assessment of substantiality is merely a step in its determination of whether the degree of separation of the executive and judicial powers vested in mayor-judges adequately safeguards, on average, those judges' impartiality.

The amount of mayor's court fee revenues is just one measure of whether the mayor may reasonably be questioned as being impartial. The more substantial the amount (or percentage) of revenue produced from a mayor's court, the more reasonable it is to question the impartiality of a mayor who has any executive authority. In similar fashion, the more executive authority vested in the mayor, the more reasonable it is to question the impartiality of a mayor who collected even a relatively minor amount of general fund revenue through a mayor's court. Thus, inadequate separation of powers in a mayor-judge may occur despite the mayor's court's collection of a fairly small percentage of general fund revenue.

For example, suppose that an "average mayor" in a village with an annual general fund of $700,000 heard only one case during the year, found the defendant guilty, and fined the defendant $7 (which went into the $700,000 general fund). The relative insub-

stantiality of the $7 fine does not conclusively establish the mayor's impartiality. A village mayor, "as executive officer, appoints the chief of police and police officers of the village, and as a judge he evaluates their credibility as against opposing witnesses." *Ward,* 27 Ohio St.2d at 193, 56 O.O.2d 110, 271 N.E.2d 757 (Corrigan, J. dissenting). There is good reason for keeping separate the executive power of appointment of police officers and the judicial power of evaluating their credibility: it is extremely difficult for the average mayor to "wear both of these hats" and still, as he must, dispense "justice [which] satisf[ies] the appearance of justice." *See In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955) (quoting *Offutt v. United States,* 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1954)). Moreover, both the impartiality and the appearance of impartiality is required of this "average mayor," regardless of how many defendants appear before him.[7]

Defendants have relied heavily on *Covington v. Lyle,* 69 Ohio St.2d 659, 23 O.O.3d 535, 433 N.E.2d 597 (1982), a case in which a village mayor found a defendant guilty of falsely reporting an automobile as stolen. The defendant challenged his conviction, claiming that the village mayor, who exercised both executive and judicial powers, could not hear the case without violating the defendant's constitutional right to due process of law. The Ohio Supreme Court denied the defendant any relief, holding that "the structure of the 'statutory form' of village government does not violate appellee's right to due process of law under either the Ohio Constitution or the United States Constitution." *Id.* at 663, 23 O.O.3d 535, 433 N.E.2d 597.

---

who is also chief executive and administrative officer of the municipality, and who as such officer is responsible for the financial condition of the municipality, violates due process of law." *Id.* at syllabus ¶ 2. In *Covington v. Lyle,* 69 Ohio St.2d 659, 23 O.O.3d 535, 433 N.E.2d 597 (1982), however, the Ohio Supreme Court accepted the trial court's having taken judicial notice that "revenue from the Mayor's court does not constitute a substantial portion of the revenue of the Village of Covington," and concluded that the system in place in that village survived constitutional attack under *Ward.*

As explained further *infra,* this Court agrees with the opinion expressed in Judge Bell's prior Order in this case "that the dissenters in *Covington* have the more correct interpretation of *Ward.*" Order at 14 (Dec. 1, 1994) (docket no. 40).

7. There is evidence that during Becker's trial, Mayor Ruoff said of the police officer who stopped Becker: "This is one of my guys. He's a real good officer and I have no reason to doubt him."

This Court finds *Covington* unpersuasive. In *Covington*, the Ohio Supreme Court specifically stated that it "look[ed] at the particular circumstances of [that] case," and saw that "[t]he Municipal Court took judicial notice that '[r]evenue from the Mayor's Court *does not constitute a substantial portion of the revenue* for the Village of Covington.'" *Id.* at 661, 23 O.O.3d 535, 433 N.E.2d 597 (emphasis added). In contrast, this Court, given the particular circumstances of this case, finds that the revenue collected from the Mayor Ruoff's court *is* substantial.

Furthermore, as noted by the dissent in *Covington*, "the determining factor" in the majority's analysis was the answer to the question "[does] the village derive[ ] a 'substantial' portion of its funds from the mayor's court?" *Id.* at 665, 23 O.O.3d 535, 433 N.E.2d 597. As explained earlier, this Court does not agree with this analysis. *Ward* teaches that, while substantiality of revenue is an important factor, it is not the determining factor. The ultimate test is whether the impartiality of a mayor-judge may reasonably be questioned, given the combination and level of his or her executive and judicial powers.

In this case, the level of executive authority vested in Mayor Ruoff is broad, so that it becomes reasonable to question Mayor Ruoff's impartiality even if he collects a fairly small amount of general fund revenue through the mayor's court. Furthermore, the amount of general fund revenue produced from Mayor Ruoff's court is, though not enormous, substantial. These undisputed facts compel the Court to conclude that Mayor Ruoff "occupies two practically and seriously inconsistent positions ... [which] necessarily involves a lack of due process of law in the trial[s] ... before him." *Tumey*, 273 U.S. at 534, 47 S.Ct. at 445. Defendant Rose "[might] with reason say that he feared he could not get a fair trial or a fair sentence." *Id.* at 533, 47 S.Ct. at 445. Accordingly, Rose is entitled to judgment on Counts I and II as a matter of law, and Rose's

motion for summary judgment on Counts I and II (docket no. 58) is GRANTED.[8]

## B. Count III

In Count III, Rose alleges that Mayor Ruoff, Officer Redmon, and the Village of Peninsula conspired to deprive him of his fundamental liberty right to be free from physical restraint, by seizing him pursuant to a traffic ordinance that they knew was invalid and improper. Rose further alleges that the defendants conspired to enforce the invalid lower speed limits specifically and only for the purpose of increasing Village revenues. Defendants have moved for summary judgment on this count, and Rose has responded that material facts remain genuinely in dispute, precluding a grant of summary judgment.

■ Defendants first seek summary judgment on wholly legal grounds. Citing *Huron Valley Hosp. v. City of Pontiac*, 887 F.2d 710, 714 (6th Cir.1989), defendants note that the protection of 42 U.S.C. § 1983 extends only to "deprivations of federal statutory and constitutional rights ... not ... official conduct that allegedly violates state law." Defendants then argue that they merely posted and enforced a speed limit that violated state law, not federal law, so 42 U.S.C. § 1983 is not implicated.

This argument ignores the allegations that the defendants violated state law for the purpose of increasing Village revenue, and with knowledge that the Village would seize and ultimately convict motorists for that purpose. If these allegations are true, then the seizure of Rose, along with other motorists, was the ultimate *goal* of posting the invalid speed limits. Moreover, these seizures would *necessarily* (and obviously) deprive the motorists of a specific and well-known constitutional guarantee. Thus, the posting and enforcement of speed limits known by the defendants to be invalid, done with the purpose of stopping motorists to increase Village

8. Despite having found that Rose was denied due process during his trial in front of Mayor Ruoff as a matter of law, the Court hastens to add that "the requirement of due process of law in judicial procedure is not satisfied [even though] ... men of the highest honor and the greatest self-sacrifice could carry it on without danger of injustice." *Tumey*, 273 U.S. at 532, 47 S.Ct. at 444.

revenues, is not merely conduct violative of state law. It is conduct that unavoidably, and allegedly by design, violates explicit constitutional guarantees. Defendants' motion for summary judgment on these legal grounds fails.

■ Defendants next argue that there is no *factual* support for plaintiff's allegation that the defendants posted and enforced the invalid speed limits with knowledge that the speed limits were improper, and for the purpose of seizing motorists to increase Village revenues. Defendants argue that the only evidence presented shows that the defendants posted and enforced the invalid speed limits solely for safety reasons.

Simply, the evidence on this point is not so one-sided that a reasonable jury could only find that defendants are entitled to a verdict. It is true that the defendants have submitted affidavits declaring that their actions were motivated only by concern for traffic safety. Indeed, defendants present a large number of apparently genuine safety-related reasons as to why the reduction of the speed limit was appropriate. However, "one can hardly expect [the defendants] to admit to wrongdoing." *Parkway Garage, Inc. v. City of Philadelphia*, 5 F.3d 685, 698 (3rd Cir.1993). And in addition to the defendants' self-professed motivation, there exists circumstantial evidence adequate to support the conclusion that Mayor Ruoff's motive behind having the speed limit changed was *not* solely for purposes of safety. This evidence includes the fact that the Village was in financial trouble, that the Mayor and other officials were seeking new sources of revenue, and that the change of speed limit signs was accomplished in a somewhat clandestine fashion, and not pursuant to state law.

The question of the defendants' "motive to engage in the conduct charged is highly relevant to whether a 'genuine issue for trial' exists within the meaning of Rule 56(e)." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 596, 106 S.Ct. 1348, 1361, 89 L.Ed.2d 538 (1986). *See*

*also Parkway Garage, Inc. v. City of Philadelphia*, 5 F.3d 685 (3rd Cir.1993) (holding that the question of whether the actions of a high ranking official were motivated by economics or safety was central to municipal liability for purposes of § 1983, and also noting that circumstantial evidence is often the best evidence of motive). Because there exist genuine issues of material fact in connection with Count III, defendants' motion for summary judgment on Count III is DENIED.[9]

## C. Count IV

■ In Count IV, Rose alleges that Officer Redmon seized him without reasonable suspicion or probable cause. Defendants have moved for summary judgment on this count, and Rose has again responded that material facts remain genuinely in dispute, precluding a grant of summary judgment.

Although Rose has presented sufficient evidence to allow a reasonable jury to conclude that Mayor Ruoff purposefully lowered the speed limit for the purpose of setting a "speed trap," in order to stop motorists and increase Village revenues, Rose has presented no evidence whatsoever that Officer Redmon had the same purpose when he stopped Rose. To the contrary, the only evidence regarding the motive of Officer Redmon is that he used his radar gun to determine Rose's speed, that the radar showed Rose was going faster than the posted speed limit and that, based on this fact, Officer Redmon stopped Rose.

Rose presents no facts suggesting that Officer Redmon knew that the posted speed limit was invalid. Indeed, Officer Redmon did not become a Village police officer until June 1, 1991, nine months after the speed limit was lowered. Given all of the evidence presented, the only reasonable conclusion is that Officer Redmon was enforcing a speed limit he believed was legitimate and lawful. Mayor Ruoff's knowledge otherwise, if it existed, does not attach to Officer Redmon, and Officer Redmon cannot be an unknowing co-

9. As discussed below, Officer Redmon may be entitled to summary judgment on Count III because there is absolutely no evidence that he had an improper motive in stopping Rose, or that he

was aware of any conspiracy. The Court does not make this distinction here, however, because it finds that Officer Redmon is immune in any event.

conspirator. Furthermore, a claim that Officer Redmon *should have* known that the posted speed limit was invalid, or *should have* known that the Village had directed him to engage in pretextual traffic stops for the purpose of increasing Village revenues, cannot stand. "Society would be ill-served if its police officers took it upon themselves to determine which laws are and which are not constitutionally entitled to enforcement." *Michigan v. DeFillippo*, 443 U.S. 31, 37, 99 S.Ct. 2627, 2632, 61 L.Ed.2d 343 (1979). Because Officer Redmon had probable cause to stop Rose, defendants' motion for summary judgment as to Count IV is GRANTED.

## VII.

### A. The Qualified Immunity Standard.

 Defendants Ruoff and Redmon have also moved for summary judgment on counts III and IV, based on qualified immunity (docket no. 50). Qualified or "good faith" immunity is an affirmative defense that is available to government officials performing discretionary functions. *Harlow v. Fitzgerald*, 457 U.S. 800, 815, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982); *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). "Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action ... assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson*, 483 U.S. at 639, 107 S.Ct. at 3038 (citing *Harlow*, 457 U.S. at 818–19, 102 S.Ct. at 2738); *Yates v. City of Cleveland*, 941 F.2d 444, 446 (6th Cir.1991). "A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all." *Siegert v. Gilley*, 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). In ruling on a summary judgment motion, a district court will consider the allegations put forth by the plaintiff, and "unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading

qualified immunity is entitled to dismissal before the commencement of discovery." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985). The United States Supreme Court has elaborated on what is meant by "clearly established:"

the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, ... but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039 (citations omitted).

 The ultimate burden of proof is on the plaintiff to show that the defendants are not entitled to qualified immunity. *Wegener v. Covington*, 933 F.2d 390, 392 (6th Cir.1991). Defendants bear the initial burden of coming forward with facts to suggest that they were acting within the scope of their discretionary authority during the incident in question. *Id.* Thereafter, the burden shifts to the plaintiff to establish that the defendants' conduct violated a right so clearly established that any official in defendants' positions would have clearly understood that they were under an affirmative duty to refrain from such conduct. *Id.* However,

summary judgment would not be appropriate if there is a factual dispute (i.e., a genuine issue of material fact) involving an issue on which the question of immunity turns, such that it cannot be determined before trial whether the defendant did acts that violate clearly established rights.... Summary judgment also should be denied if the undisputed facts show that the defendant's conduct did indeed violate clearly established rights. In either event, the case will then proceed to trial, unless the defendant takes a successful interlocutory appeal on the issue of qualified immunity.

*Poe v. Haydon*, 853 F.2d 418, 426 (6th Cir. 1988), *cert. denied*, 488 U.S. 1007, 109 S.Ct. 788, 102 L.Ed.2d 780 (1989) (citations omit-

ted). *Accord, Brandenburg v. Cureton,* 882 F.2d 211, 215–16 (6th Cir.1989).

Thus, to determine if defendants Ruoff or Redmon violated any clearly established constitutional rights such that they would not be entitled to rely on qualified immunity, it is necessary for the Court to decide (1) what the state of the law was on July 9, 1991, when Rose was stopped and cited by Redmon, and (2) whether there is a factual dispute on which the question of their immunity turns.

### B. State of the Law on July 9, 1991.

The general right of persons to go where they choose, free from physical restraint, is secured by the Fourteenth Amendment. *Allgeyer v. State of Louisiana,* 165 U.S. 578, 589, 17 S.Ct. 427, 431, 41 L.Ed. 832 (1897) (at a minimum, the "liberty" mentioned in the Fourteenth Amendment "means ... the right of the citizen to be free from ... physical restraint"); *Munn v. Illinois,* 94 U.S. 113, 142, 24 L.Ed. 77 (1877) (Field, J., dissenting) ("By the term "liberty," as used in the provision, something more is meant than mere freedom from physical restraint or the bounds of a prison. It means freedom to go where one may choose."). The right to be free from unreasonable seizures is secured by the Fourth and Fourteenth Amendments, and a seizure is unreasonable if made without reasonable suspicion or probable cause.

It is not these general rights, however, but rather "particularized rights" that plaintiff must show were clearly established in order to avoid the defense of qualified immunity.

As Judge Bell stated earlier in this case, plaintiff Rose "claims that he was seized pursuant to an illicit law designed purposefully to create a pretext for seizing citizens and trying to collect fines from them based on the false appearance of wrongdoing created by the Village's illicit speed limit signs." Order at 20 (Dec. 1, 1994) (docket no. 40). The question this Court must answer thus becomes: Did the state of the law on July 9, 1991 give defendants reasonable notice that a pretextual stop of a motorist, based on speed limit signs they knew to be illicit, was a violation of the motorist's constitutional right to be free from physical restraint?

The answer to this question is clear. There can be no doubt that a stop and seizure of a citizen for a traffic violation is an infringement of the fundamental right to be free from physical restraint. *Terry v. Ohio,* 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968) ("whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person."). A traffic stop, of course, is allowed if there exists probable cause to believe that the motorist has broken the law. And any traffic violation, however minor, provides probable cause for a traffic stop. *United States v. Barahona,* 990 F.2d 412, 416 (8th Cir.1993). But there can be no valid argument that changing the speed limit from 50 m.p.h. to 35 m.p.h., in order to purposefully make it *appear* that a motorist has broken the law when he or she has not, provides even a reasonable suspicion that a motorist going 50 m.p.h. has *in fact* broken the law. To the contrary, a suspicion that the motorist has broken the traffic laws based on these facts is completely unreasonable.

Defendants cannot argue seriously that the state of the law on July 9, 1991, gave them no indication that their seizure of Rose, pursuant to an illicit law designed purposefully to create a pretext for seizing citizens based on the false appearance of wrongdoing, was illegal. The law of the Fourth and Fourteenth Amendment was sufficiently clear and well-developed in 1991, if not 1791, that a reasonable official would understand such actions violate explicit constitutional guarantees. *See, e.g., Adams v. Metiva,* 31 F.3d 375, 387 (6th Cir.1994) ("A reasonable person would know that creating a pretext of a seat belt violation in order to harass the passenger of a car ... would violate the right to be free from unreasonable seizures.").

### C. Factual Disputes on Which the Question of Immunity Turns.

The question addressed immediately above was: "Did the state of the law on July 9, 1991 give defendants reasonable notice that a pretextual stop of a motorist, based on speed limit signs *they knew to be illicit,* was a violation of the motorist's constitutional right

to be free from physical restraint?" The answer to this question is yes. However, the question assumes that the defendants knew the speed limit signs were illicit and, thus, that a traffic stop for violation of the posted speed limit was pretextual. This assumption is a question of fact.

As discussed earlier in Section VI.B of this memorandum, a genuine factual dispute does exist regarding whether Mayor Ruoff knew the speed limit signs were illicit, and whether he was motivated to have the signs posted for the sole purpose of increasing Village revenues through pretext. Rose presents circumstantial evidence to support his claim that Mayor Ruoff knowingly acted outside of the scope of his discretionary authority when he had the speed limit signs changed for illicit purposes, leading unavoidably to the traffic stop of Rose. Whether Mayor Ruoff is immune thus becomes a question of disputed fact. Accordingly, Mayor Ruoff may not rely on qualified immunity to obtain summary judgment on Counts III or IV.

There is no genuine factual dispute, however, regarding whether Officer Redmon knew, the speed limit signs were illicit. There is no evidence showing that Officer Redmon had any basis to know that the traffic stops he made based on the speed limit signs were pretextual. As discussed earlier in Section VI.C of this memorandum, the only reasonable conclusion is that he did *not* know the signs were illicit. Officer Redmon believed he was, and was in fact, acting within the scope of his discretionary authority when he stopped Rose. Accordingly, Officer Redmon is immune from judgment on Counts III and IV of plaintiff's complaint. Thus, defendants' motion for summary judgment on Counts III and IV based on qualified immunity (docket no. 50) is GRANTED as to Officer Redmon, and DENIED as to Mayor Ruoff.

## VIII.

The Court's rulings on the parties' different motions for summary judgment resolve all of the claims in this case, except that Count III remains a valid claim against Mayor Ruoff and the Village. The parties are directed to appear for a status conference at 3:00 p.m., February 13, 1995, to discuss scheduling of further proceedings necessary in this case.

**IT IS SO ORDERED.**