JOURNAL ENTRY AND OPINION
Plaintiff-appellant Lora Elias (Elias)[1] appeals from the jury trial judgment in favor of defendant-appellee Edward Macek, Jr. (Macek) in this action alleging fraud associated with the sale of a building located at 5325 Fleet Avenue, Cleveland, Ohio. The fraud claim was premised on the alleged concealment of water leakage in the basement of the building and the failure to disclose latent defects. For the reasons adduced below, we affirm.
A review of the record on appeal indicates that the dealing between the parties leading up to the sale began in the summer of 1997, between late July and early August, when Elias approached Macek and expressed interest in purchasing the home, which was not for sale at the time.[2] As a result of this interest, Elias had the building inspected by Metro Home Inspections, Inc. (Metro). The inspection was conducted on August 10, 1997, by John Sender, and his report, dated August 11, 1997, see Defendant's Exhibit A, reflected a number of concerns, including the following:
 1. In the roof and attic section of the report, at Storm drainage, Replace the missing downspout in the South-West corner and repair the cracked tile there. The concrete sidewalk in this area also needs repair to prevent water running toward the building.
 2. In the foundation section of the report, at Walls, The stone foundation had no visible structural concerns, but the basement has excessive dampness. The walls are not considered dampproof. ;
 3. In the foundation section of the report, at Framing, There were no structural concerns, but the wood has excessive dampness. Some areas were over 20% moisture. The crawl space does not have a vapor barrier, and the entire foundation lacks proper ventilation to remove this moisture.
On August 29, 1997, the parties executed a typewritten Offer to Purchase, Acceptance with regard to the building in question. See Plaintiff's Exhibit 4. The purchase price was $106,000. Within this agreement, at item 14, the following restriction was provided:
 14. Other Representations. All parties hereby acknowledge receipt of a full and complete copy of this Offer and declare that no promises, representations or agreements, other than those herein contained, have been made or relied upon.
As a result of this agreement, Macek asked the first floor tenant to vacate the premises so that Elias could begin renovation of the space in preparation of operating her dental practice from the first floor of the building.
On January 21, 1998, Macek executed and recorded a general warranty deed for the property in question in favor of Elias. See Plaintiff's Exhibit 5.
On October 8, 1999, Elias filed her Complaint alleging fraudulent concealment of known defects by Macek in the sale, to- wit, water leakage in the basement and termite damage to the structure. See Complaint at paragraph 4.
The matter was tried to a jury commencing on the afternoon of Thursday, July 13, 2000, and lasted until the evening of Friday, July 14, 2000.
At the trial, Elias offered the testimony of five (5) witnesses while Macek offered the testimony of four (4) witnesses.
The first witness for the plaintiff was John Sender, the owner of Metro and the inspector of the building, who did so at Elias' request. Mr. Sender testified he performed a partial inspection while accompanied by the parties and John Webber, a good friend of the witness and Elias' significant other. Tr. 52. Mr. Sender was also a good friend of Elias. During his inspection of the basement he noted a lot of dampness in a wall, but did not see any visible sign of seepage, and that Macek denied any seepage. Tr. 43, 46. Sometimes, his moisture meter was off the meter, indicating high moisture levels, sometimes registering 20% in the wood and even greater in parts of the walls. Tr. 74-76. The witness differentiated between seepage, which implies there is water coming through the surface, and dampness, which implies moisture being present in the surface, but no moisture coming through the surface. Tr. 43, 46. He also told Elias at the time of the inspection about the dampness present in the walls and the wood framing members. Tr. 44, 76. He considered dampness to be a problem common to 90% of the thousands of basements he has inspected. He had no knowledge of what Elias was paying for the building. He had offered to do a more thorough inspection of the property, but Elias desired only a limited inspection. Tr. 55. The witness noticed during his inspection that there was some type of coating on the wall, applied relatively recently, but lacking any odor of paint or visible staining, and that he considered it to be a cosmetic application and was not intended to prevent seepage. Tr. 73-74, 96. At the time of the inspection, the witness also warned Elias that the improperly sloped sidewalk could cause dampness in the basement. Tr. 82. The witness opined that a de- humidifier would help the dampness problem in the basement, but would not eliminate excessive dampness. Tr. 88. Given the excessive dampness in the basement, it was his opinion that it was not reasonable for Elias to rely on Macek's statement during the inspection that a de-humidifier was all that the basement needed to control the excessive dampness. Tr. 90-91. The witness believed that the building in question was built at least seventy years ago. Tr. 95. During the inspection Macek said there was no seepage in the basement and the witness did not observe any signs of seepage at the time of the inspection, yet Elias complained of seepage to the witness some time after the inspection. Tr. 98-101, 108. The witness was not denied access to any area of the building by Macek or Elias during the inspection. Tr. 104-105. The rust on the furnace in the basement is a sign of dampness. Tr. 107-108.
The second witness for Elias was Richard Parsons, who occupied the first floor of the building as a contracting (construction) business tenant of Macek's for a period of approximately the first nine to ten months of 1997. Tr. 112-114. Parson testified that he stored some of his belongings in the basement of the building, and that he would visit the space at least four times per week. In the basement he noticed seepage after heavy rains. Tr. 115, 123-124. There was a general understanding between he and Macek that the basement had water problems; the witness did not consider the condition of the basement to be a problem because he used it for storage. Tr. 116, 118. He did not see any termites, but some of the wood in the basement was deteriorated. Tr. 119. On cross- examination, Parsons testified that during some remodeling in which he and a friend replaced the kitchen floor and made repairs to some of the floor joists above the crawl space, it was discovered that the drain for the sink in the kitchen was not connected to the sewer system; instead, the water from the sink drained onto the ground beneath the crawl space under the kitchen. Tr. 126-130. The joists supporting this crawl space were soft. Tr. 131. Some of his belongings in the basement were elevated off the floor by pieces of two-by-four lumber. Tr. 140-141. He considered the dampness and seepage normal and to be expected for a building of that age. Tr. 143. He never saw any termites or boring insects in the basement. Tr. 145, 147-148. At the time he did the remodeling work to the kitchen area, Macek was not intending to sell the building at that time. Tr. 157.
The third witness for Elias was Macek, who was called as on cross-examination. Macek testified that he purchased the building in August of 1993. Tr. 163. The defense stipulated that no disclosure statement was provided by him to Elias when Elias was negotiating to purchase the building. Tr. 167. Contrary to the testimony of Mr. Parson, Macek admitted to storing his electric lawn mower in the basement, but contrary to the testimony of Mr. Parson, denied storing it up off the floor. He was never aware that water came into the basement after a heavy rain, and never saw water seepage in the basement. Tr. 170-171. He vacated the building on May 31, 1998. He also corroborated Mr. Sender's testimony regarding the home inspection. Tr. 176, et seq. . Elias first took occupancy in the building on October 1, 1997, but her obtaining financing delayed the transfer of the title until January 27, 1998. Tr. 179-180. After taking up occupancy, Elias began making improvements to the first floor suite in anticipation of opening a dental office. Apart from the formal home inspection, Elias walked through the entire building when she first expressed interest in buying the property. Tr. 183.
The fourth witness for Elias was John Webber, who testified that he was present during the pre-sale home inspection. Tr. 187. He stated that the inspection covered only the first floor and the basement. The witness corroborated the testimony of Macek and Sender concerning the discussion of dampness in the basement during the inspection. Tr. 189. According to the witness, Macek said that the basement was just damp, that all that was needed was a de-humidifier to take care of the problem. Tr. 189. It was dry weather when the pre-sale inspection was performed. Tr. 191. After the sale, in 1998, Elias called him complaining of water in the basement after a very heavy rain. See Tr. 223. He personally observed this condition, and that the water came through the basement walls. Tr. 192. During his remodeling efforts on the first floor, demolition revealed soft wood framing in the floor and what the witness thought was insect damage to that wood. Tr. 204-205.[3] On cross-examination, the witness admitted that the dehumidifier, which was placed in the basement sometime in the first quarter of 1998, worked for the most part in controlling the excessive moisture in the basement and that they placed material on the basement floor despite having knowledge of the moisture problem and that the walls were not considered to be damp-proof. Tr. 239-248. In the remodeling of the first floor for a dental office, the demolition involved removing the walls down to the framing and replacing certain sections of the floor, gutting the space. Tr. 253-255. The witness admitted that his education as to what insects would do in a structure was almost zero. Tr. 256. He did not see any insects when replacing some of the wood from the house, but claimed that this discarded wood showed signs of insects having created tunnels in the wood. Tr. 259-265. No expert inspected the deteriorated wood to determine whether the deterioration and tunneling was caused by insects or by water damage. Tr. 266. On re-direct examination, the witness testified that Macek had stated that there was no water coming into the basement and that Macek never informed them about insect infestation in the wood. Tr. 276. According to the witness on re- cross examination, Elias called an insect exterminator to come and treat the building and he is unaware if there remains an insect infestation problem in the building or that it was confirmed that termites were the specific problem or that there were any wood boring insects on the premises. Tr. 279-280. The witness believed the building to be approximately 100 years old. Tr. 284.
The fifth, and final, witness for the plaintiff was Elias. See Tr. 288-458. Elias generally corroborated the testimony of her fellow witnesses. In addition, Elias testified that she received her dentistry degree in 1990 and that her undergraduate degree in college was biology with a zoology concentration. Elias reiterated her claim that during the pre-sale inspection she was advised that the basement was excessively damp so she asked Macek if the basement leaked and Macek responded, No, nothing comes in, and, No, you just need a dehumidifier, that would take care of the problem at hand. Tr. 295. She claimed that she relied on this response of no leakage. Tr. 296. Elias never specifically asked Macek about insects during the course of the inspection. Instead, she asked generally, is there anything I should know? . Tr. 297. Because Macek did not reveal anything, she took his silence to mean that there were no further problems with the structure. Tr. 297- 298.
Elias gained access to the building in October of 1997, paying rent to Macek in the monthly amount of $525 and beginning to clean out and remodel the first floor space, while waiting for her bank financing to be approved. According to Elias, Macek moved out of his second floor suite on may 26, 1998. She first noticed significant amounts of water in the basement after a heavy rain at the end of May or beginning of June in 1998, after Macek had moved out. Tr. 303-304. When she inquired of Macek prior to his moving out if he was aware of any bug damage after she noticed that some of the support for the flooring was soft, Macek allegedly told her that this softness must have been caused by water damage from a hair styling salon which had previously used the first floor. Tr. 306. Elias testified that she paid an excessive amount (she paid $106,000 for a property worth, according to her, no more than $35,000) for the building given the allegedly concealed damage to the structure. Tr. 308-309. Her personal property and dental supplies, which she stored in the basement, were damaged by the water at the end of May, 1998, representing a loss of approximately $4,000. Tr. 309-312.[4] At the time of the inspection, the walls looked to be in good shape with nothing wrong with them. Tr. 315. Elias testified that the flaking, depicted on a basement wall near the furnaces in Plaintiff's Exhibit 18 (one of the photographs taken in anticipation of litigation and/or trial), was not present at the time of the inspection. Tr. 324. Elias was positive that no leakage problems developed in the basement until after Macek had moved out. Tr. 327. When questioned by the court, Elias testified that there was no change in the paint on the basement walls, no cracking or peeling, until approximately May of 1998. Tr. 365. She did not know if Macek did anything in the basement to conceal any problem. Tr. 366. Elias stated that she was not concerned that the inspector's moisture meter went off the meter. Tr. 374. She never reconsidered her decision to purchase the building. Tr. 376. She has not corrected the improperly sloped sidewalk beside the building, but did make improvements to the gutter downspout in that area. Tr. 380-383. Macek made the repairs called for in the purchase agreement. Tr. 383. She was aware that she overpaid for the property when she negotiated the purchase price. Tr. 395. Elias was aware at the time of the negotiations that comparable properties were valued at approximately $50,000.
At the close of the plaintiff's case the defense moved for a directed verdict. Tr. 426. This motion was denied. Tr. 443.
The defense offered the testimony of four witnesses. The first defense witness was Macek's mother, Mrs. Gloria Macek, who testified that she had been to the building in question on many occasions and had witnessed many things being stored in the basement on the floor in 1993, when her son purchased the building. She never saw any evidence of water damage in the basement, or deteriorated basement walls, in 1993, but the basement did smell basementy. Tr. 453.
The second defense witness was Michael Nawalaniec who testified that he was hired to update a security system and a smoke alarm on the first floor of the building in question between December of 1996 and January of 1997. He observed the soft flooring over the crawl space of the first floor, and opined that this softness was caused by a former tenant having a sink whose drain was not connected to the sewer system, but instead allowed the waste water from the sink to seep directly onto the dirt floor of the crawl space. The witness observed the rotted wood flooring over the crawl space, and its supports, being replaced. Tr. 464. In performing electrical work for the security system in the basement, he saw no evidence of termites or wood-boring insects. Tr. 466, 470, 479, 481-482. He stated that the basement was dirty and dusty, was not damp, and had no standing water. Tr. 472. He also performed some security work in the building just after Macek had purchased the building, and he did not observe any evidence of water damage in the basement at that time. Tr. 474. The witness is Macek's brother-in-law. He was certain that wood-boring insects were not causing the damage to the plywood flooring because it was his opinion that such insects do not eat the epoxy glue which binds the veneer layers of the plywood together; the plywood was damaged by water. Tr. 481-484.
The third defense witness was Calvin Craig, a friend of Macek's, who testified that he had been inside the building in question dozens of times from 1994 through 1997. Craig testified that Macek would store his lawnmower in the basement and this lawnmower was not elevated off the floor. He never observed evidence of standing water on the basement floor or seepage through the basement walls. Tr. 525-527, 540-541. He was present during the home inspection and the inspector was not denied access to any area of the building. Tr. 526. To the best of his knowledge, Macek never treated the surface of the basement walls. Tr. 530. He denied that Macek said anything about seepage, water damage, or that a de-humidifier would be helpful to combat dampness, during the home inspection. Tr. 536, 546-547, 548-549. Macek never exhibited any concern for wetness in the basement. Tr. 549-550.
The final defense witness was Macek, who testified on his own behalf and generally reiterated his prior testimony. He denied ever painting the basement walls with any material and denied scraping the surface of the basement walls at any time. Tr. 560. The basement floor and walls, the furnace, washer and dryer, and hot water tanks, and utility services, as depicted in rusty or deteriorated condition in the plaintiff's evidentiary photographs, are in the same condition as at the time Macek sold the property to Elias. To the best of his knowledge, the problems with the soft flooring on the first floor were repaired, and these repairs were not done with any intent to conceal defects. Tr. 569, 594-595. He had no knowledge of any damage from wood boring insects in his building. Tr. 570. He has never received any complaints, from anyone, about standing water in the basement or that items stored in the basement were being damaged by excessive moisture. Tr. 571- 572. After Elias moved into the building in October of 1997, he had no access to the first floor and the basement. Tr. 573. The home inspector and Elias were not denied access to any part of the structure as part of the inspection. Tr. 575. He had no idea what caused the softness in the first floor flooring until the floor was pulled up and the lack of a properly plumbed drain was discovered leading from a sink. Tr. 577-578. During the inspection, no one asked him if the walls seeped water, whether there was a water problem in the basement, or if there was a standing water problem. Tr. 578-579. He did not recall recommending the use of a de-humidifier but he thought it was a common sense solution to an excessive moisture problem, a problem which was indicated by the inspector. Tr. 579-580, 590. He never had a de-humidifier in the basement during his ownership of the building. Tr. 580. No one asked him during the inspection about any repairs he had done to the property during his ownership or about anything concerning the structure itself. Tr. 603-604.
Subsequent to the jury returning a unanimous defense verdict after approximately one and one-half hours of deliberation on July 14, 2000 (which verdict was journalized on July 19, 2000 at Journal Vol. 2486, page 296), Elias filed on August 1, 2000, a motion for a new trial/judgment notwithstanding the verdict alleging the following grounds: (1) misconduct of defense counsel; (2) that the jury was not instructed properly by the court; (3) improper jury interrogatories were submitted to the jury where the parties did not request these interrogatories be submitted, and the interrogatories which were submitted to the jury were unduly burdensome and prevented a verdict in favor of the plaintiff; (4) improper argument by defense counsel during closing argument.
This appeal from the unanimous defense verdict presents seven (7) assignments of error. Where appropriate, the assignments will be addressed jointly.
The first and second assignments of error provide:
 I PLAINTIFF WAS DENIED A FAIR TRIAL BY REASON OF IMPROPER CONDUCT BY DEFENSE COUNSEL DURING THE COURSE OF TRIAL.
 II PLAINTIFF WAS DENIED DUE PROCESS OF LAW WHEN THE COURT DID NOT AWARD A NEW TRIAL BY REASON OF MISCONDUCT OF DEFENSE COUNSEL FOR DEFENDANT DURING CLOSING ARGUMENTS.
In arguing these assignments, appellant points to dozens of isolated passages[5] from the trial in an effort to demonstrate that the trial court did not adequately control the courtroom (see assignment I) when faced with defense counsel's purportedly improper questioning and/or commentary, and that defense counsel's purported misconduct in commentary during closing argument was so egregious as to deny appellant a fair trial (see assignment II).
Reviewing the entire record, it is immediately evident that this trial was vigorously contested by the parties. In the first assignment, appellant essentially argues that the trial court was a disinterested entity which took no action to ensure a fair trial, thereby not maintaining impartiality. See appellant's brief at 15-16, citing Jones v. Macedonia-Northfield Banking Co. (1937), 132 Ohio St. 341. The numerous passages cited by appellant in her first assignment indicate the following: (1) that plaintiff's counsel voiced no objection in nineteen of the passages, thereby waiving appellate error therein, see Goldfuss v. Davidson (1997), 79 Ohio St.3d 116, 121, 679 N.E.2d 1099 (failure to timely advise a trial court of possible error, by objection or otherwise, results in a waiver of the issue for purposes of appeal); (2) that the trial court sustained plaintiff's counsel's objections in ten of the passages; (3) that the trial court overruled plaintiff's counsel's objections in nineteen of the passages. In sustaining objections, the court properly acted to limit irrelevant or unnecessarilyargumentative testimony. In the instances where the trial court overruled plaintiff counsel's objections, such ruling was proper where the questioning was relevant to a fact or testimony in issue, or the allegedly objectionable question had been answered before the court could make a ruling. The few remaining instances concern defense counsel objecting to various testimony or the court advising counsel of courtroom procedure it wished counsel to employ. We see no error in these very limited passages which would so negatively impact the proceedings as to prevent a fair trial based on the totality of the record.
In the second assignment, appellant argues that defense counsel committed misconduct during closing argument by misrepresenting what was stated in court, making a personal appeal based on passion and prejudice and in effect testifying to the jury based on what counsel's unsubstantiated personal knowledge. Appellant's brief at 16.
The jury was instructed that evidence includes all the testimony received from the witnesses and the exhibits admitted during trial, stipulated facts and any facts the court required to be accepted as true. Tr. 679. Evidence did not include any statement of counsel made during the trial and that opening statements and closing arguments are not evidence. Tr. 680. Considering the examples of alleged misconduct provided by appellant in her brief at 17-19, the passages provided constitute proper commentary based on the evidence and testimony.
The first and second assignments of error are overruled.
The third assignment of error provides:
 III PLAINTIFF WAS DENIED A FAIR TRIAL WHEN THE COURT PERMITTED COUNSEL TO TELL THE JURY WHAT CAVEAT EMPTOR MEANT.
During closing argument, defense counsel gave to the jury counsel's interpretation of the purpose underlying the doctrine of caveat emptor:
***
 Remember me talking about caveat emptor in opening argument? Here is the definition of caveat emptor.
 MR. MANCINO: Objection. It's something that we all — —
THE COURT: Overruled.
 MS. PASSALACQUA: — — heard about. Can you all see that? Caveat emptor is designed to finalize real estate transactions by preventing disappointed real estate buyers from litigating every imperfection existing on the property. (Tr. 652-653.)
***
On appeal, appellant argues that this interpretation of caveat emptor is not accurate and the trial court permitting this interpretation to be before the jury constituted a tacit approval of that interpretation being the law on caveat emptor. Appellant's brief at 23.
Appellant conveniently overlooks the court's extensive instruction to the jury regarding the doctrine of fraudulent concealment, which incorporated the elements of caveat emptor as announced in Layman v. Binns (1988), 35 Ohio St.3d 176. See Tr. 687-693. There is no demonstration that the jury did not follow its instruction to apply the law given to it by the trial court with regard to fraudulent concealment. See Tr. 677.
The third assignment of error is overruled.
The fourth assignment provides:
 IV PLAINTIFF WAS DENIED A FAIR TRIAL BY REASON OF THE OVER ACTIVE PARTICIPATION BY THE COURT IN QUESTIONING WITNESSES AND MAKING COMMENTS DURING THE TRIAL.
In this assignment, appellant, citing twenty-nine separate passages in the trial transcript where the court asked questions of various witnesses, argues that the trial court deprived appellant a fair trial by giving the court's opinion of the evidence or the credibility of a witness during its questioning.
The ability of a trial court to question witnesses was discussed in MetropolitanLife Ins. Co. v. Tomchik (1999), 134 Ohio App.3d 765,794-795:
 Evid.R. 614(B) permits a trial judge to interrogate a witness as long as the questions are relevant and do not suggest a bias for one side or the other. State v. Blankenship (1995), 102 Ohio App.3d 534, 548, 657 N.E.2d 559. Absent a showing of bias, prejudice, or prodding of the witness to elicit partisan testimony, it is presumed that the trial court interrogated the witness in an impartial manner in an attempt to ascertain a material fact or develop the truth. Id. A trial court's interrogation of a witness is not deemed partial for purposes of Evid.R. 614(B) merely because the evidence elicited during the questioning is potentially damaging to the defendant. Id.
 In addition, under Evid.R. 611, a trial court has discretion to control the flow of a trial. State v. Prokos (1993), 91 Ohio App.3d 39, 44, 631 N.E.2d 684. Since a trial court's powers pursuant to Evid.R. 611 and 614 are within its discretion, a court reviewing a trial court's interrogation of witnesses and comments must determine whether the trial court abused its discretion.
 Mentor-on-the-Lake v. Giffin (1995), 105 Ohio App.3d 441, 448, 664 N.E.2d 557.
A review of the entire transcript fails to demonstrate that the trial court abused its discretion under Evid.R. 611 or 614(B). Instead, the trial court's comments and questions demonstrate a reasonable attempt to maintain order in the courtroom, to monitor the presentation of evidence, and to impartially clarify what it believed was incomplete or confusing testimony. The examples offered by appellant when viewed in the context of the entire trial fail to demonstrate that the trial court exhibited bias or partiality towards either party.
The fourth assignment of error is overruled.
The fifth assignment provides:
 V
PLAINTIFF WAS PREJUDICED BY THE COURT'S
 SPECIFIC INSTRUCTION CONCERNING WHETHER PLAINTIFF WAS ENTITLED TO HAVE BEEN ADVISED CONCERNING WHETHER SHE NEEDED A LAWYER IN THE TRANSACTION.
During the trial, Macek testified that defense counsel represented both parties in the sale of the property. Plaintiff also sought to advance its theory that defense counsel was obligated to determine whether Elias had representation and, if she did not, to advise Elias that she should obtain counsel to represent her in the purchase of the property. This was done in an obvious effort to persuade the jury that Elias was in an inferior bargaining position and was taken advantage of by Macek and his counsel. This testimony and theory were vigorously attacked by the defense, who was adamant that defense counsel only represented the seller (Macek) in the transaction. As part of its instructions, the trial court charged the jury in pertinent part:
***
 I am also compelled to tell you that a lawyer in a real estate transaction or in a civil action has no duty to inform the other party that they're not representing them and that they have the option of having a lawyer, unlike in a criminal case.
 In a criminal case, the defendant is charged with a crime, and has a right to counsel. If a defendant is charged with a crime and is unable to afford counsel, then the State must provide counsel for a criminal defendant to be represented, and the criminal defendant has a right to waive his right to counsel. In a civil case, it doesn't go that far. Anybody can have an attorney. If they choose not to have an attorney represent them, that's their choice, and another attorney does not have a duty to tell someone to go get an attorney.
 Okay. I felt that I needed to mention that to you, as this was raised in the closing arguments. (Tr. 676-677.)
***
The court then instructed the jury that defense counsel was not a party to the action. Tr. 677.
The preceding three-paragraph instruction was objected to by the plaintiff, who considered the plaintiff's theory (regarding counsel's duty to advise an opposite party in a real estate transaction) proper under an unexplained principal/agent theory being purportedly applicable between the seller and his counsel. Tr. 713. The trial court overruled this objection. Tr. 713-714.
Given the evidence and testimony at trial, and the fact that defense counsel was not a party to the action, the trial court's instruction was entirely proper under the circumstances. There is simply no duty, and appellant cites to no authority mandating such a duty, for counsel in a civil transaction to advise an opposite party that the opposite party should obtain counsel.
The fifth assignment of error is overruled.
The sixth assignment provides:
 VI
THE COURT COMMITTED PREJUDICIAL ERROR IN NOT GIVING PLAINTIFF'S REQUESTED INSTRUCTIONS CONCERNING THE FAILURE TO FURNISH A DISCLOSURE STATEMENT.
The defense stipulated that a residential disclosure statement, required by R.C. 5302.30 in the transfer, was not given to Elias as part of the transaction. Elias requested a proposed jury instruction which would have created an inference of an intent to deceive based on the failure to furnish the disclosure statement. The court gave the following instruction relative to the disclosure form:
***
 Residential disclosure form. Ohio law requires that a transferor or residential real estate containing one to four dwelling units to disclose in writing material defects actually known to the transferor without regard to the observability or discoverability of the alleged defect.
 However, the defendant's failure to prove the residential disclosure form, absent more, does not permit a plaintiff to recover for fraudulent concealment. Plaintiff must still show by a preponderance of the evidence all of the elements of a fraudulent concealment, including that the concealment was material to the transaction, the concealment was made with the intent of misleading the plaintiff into relying upon it, the plaintiff was justified in relying on the concealment and did in fact so rely, and the plaintiff was damaged, and the damage was proximately caused by her reliance upon the concealment.
 You are to determine what weight, if any, should be given to defendant's failure to provide a residential disclosure form. (Tr. 693-694.)
***
Appellant argues in general fashion without citation to authority that it was the intent of the General Assembly in R.C. 5302.30 to grant some relief in order to make the statute effective, that plaintiff should be afforded a civil remedy for the failure to provide the form, and not having an inference of intent to deceive in this case would render the statutory duty to provide one ineffective and thereby reward the seller for not having provided the form. See appellant's brief at 36-37. Noticeably absent from appellant's argument is any authority which would require the proposed inference of deception in an action where the seller fails to provide a real estate disclosure statement. In fact, R.C.5302.30(K)(4) provides a remedy for a purchasing party who is not given a disclosure statement form by the seller, that is, the right to rescind the transfer agreement within the earlier of either thirty days after acceptance of the transfer offer or the date of closing. Elias chose not to pursue rescission. In addition, R.C. 5302.30(J) does not limit the obligation to disclose any item which may exist in order to prove fraud in a transaction of residential real property and the aggrieved party is recognized as still having a right to maintain a civil action. Having failed to timely rescind the transfer of the property, Elias properly invoked her available remedy of filing the present civil action for fraudulent concealment.
The sixth assignment of error is overruled.
The seventh assignment provides:
 VII THE COURT ERRED IN SUBMITTING JURY INTERROGATORIES WHICH WERE NOT REQUESTED BY ANY PARTY.
The trial court submitted, sua sponte, eight interrogatories to the jury. The first interrogatory contained this question:
 Has plaintiff, Lora Elias, proven by a preponderance of the evidence that the defendant, Edward Macek, fraudulently concealed and/or misrepresented any material information concerning the condition of the subject property that was not known to the plaintiff? (Tr. 700-701.)
If the answer to the first interrogatory was yes, the jury was to then consider the second interrogatory, which contained this instruction:
 If you answered Interrogatory No. 1 yes, then identify the material information defendant Edward Macek fraudulently concealed, misrepresented to plaintiff, Lora Elias. (Tr. 701-702.)
The jury was then instructed to proceed to the third interrogatory, which asked this question:
 Has plaintiff proven by the preponderance of the evidence that the plaintiff (sic) fraudulently concealed and/or misrepresented information to the defendant (sic), Edward Macek (sic), was material to a decision to purchase the subject property? (Tr. 702.)[6]
The fourth interrogatory provides this question:
 Has plaintiff, Lora Elias, proven by the preponderance of the evidence the conduct of the defendant, Edward Macek, was a direct and proximate cause of her damages? (Tr. 703.)
The fifth interrogatory provides this question:
 What is the actual amount the plaintiff, Lora Elias's damages proximately caused by the fraudulent acts of the defendant, Edward Macek? (Tr. 704.)
The sixth interrogatory provides this question:
 Upon the evidence presented, do you find that the defendant, Edward Macek, exhibited the necessary elements of malice or ill will or that the wrongdoing of Mr. Macek was particularly gross or egregious in its perpetration of this fraud? (Tr. 705.)
The seventh interrogatory provides this instruction:
 State the amount of damages to be awarded to the plaintiff, Lora Elias, as a result of the defendant, Edward Macek's fraud. (Tr. 705-706.)
The eighth interrogatory provides this question:
 Do you find that the attorney fees should be awarded to plaintiff, Lora Elias, against defendant, Edward Macek, as a result of this fraud? (Tr. 706.)
Defense counsel objected to these interrogatories at the close of the jury charge, as follows:
 MR. MANCINO: The other thing, I don't think anybody requested interrogatories. I would say if you are going to do the interrogatories, just not do the interrogatories number. Just leave it with interrogatory No. 1 and 2, and not — — THE COURT: Those are all the elements of fraud. It's necessary in all the fraud cases.
 It's necessary to lay out the elements of the interrogatories so that they understand that each and every element must be met in order to have a finding of fraud made against the other party. So in the interrogatories, in fact every question outlines one of the elements, and it came from my last two cases.
 MR. MANCINO: I thought the requirement of proving punitive damages by clear and convincing (sic) was ruled unconstitutional by the Ohio Supreme Court.
 THE COURT: You don't believe the burden of proof in a punitive damage case is what? MR. MANCINO: It's preponderance.
THE COURT: I will note your objection.
 MR. MANCINO: I know the Legislature at one point passed a statute making that the burden. I think the Supreme Court in one of the cases ruled it unconstitutional.
 THE COURT: I stand by my decision on these instructions from the few trials that I had, and the lawyers argued that the standard changes when it comes to punitive damages to clear and convincing evidence as the burden of proof. But I note your objection. Anything else?
MR. MANCINO: Nothing.
 MS. PASSALACQUA: No, your Honor. I am satisfied with both the interrogatories as well as the charge to the jury. (Tr. 714-716.)
On appeal, appellant-Elias abandons her stated objections to the interrogatories which were raised at trial, and instead generally argues that interrogatories 1-3 were overly burdensome and contributed to the jury, who received the case for consideration of a verdict at approximately 6:00 p.m. on the afternoon of its last day (Friday, July 14, 2000) of the jury's scheduled one business week jury duty period, rushing through its duties by delivering a defense verdict after approximately one-and- a-half hours of deliberation. Appellant argues that the jury did not want to return for further deliberations on Monday, July 17, 2000, and could not have possibly considered the evidence in such a short amount of time prior to returning its verdict.
While it is true that juror number 7, after opening statements, but prior to the plaintiff calling her first witness, expressed her belief that she could not stay for jury duty subsequent to Friday, July 14, 2000 because of employment concerns, see Tr. 33, the court did not release this juror and advised counsel of same. Neither party sought juror number 7's replacement by an alternate juror at the time the court informed counsel of juror number 7's predicament when any problem could have been easily avoided, and both parties proceeded to put on their evidence. Permitting juror number 7 to deliberate the case was invited by appellant's counsel; he cannot now complain that juror number 7 remained seated on the panel. Also, one cannot infer from a remark made to the court prior to the presentment of evidence that juror number 7 did not faithfully carry out her oath to hear the case without bias and make her decision based on the evidence, or that juror number 7 would not have complied with her duty to return for deliberations on that Monday should the need have arisen. To suggest otherwise, as appellant infers, is pure speculation. The fact remains that the defense verdict was unanimous with all eight jurors concurring in that verdict. Appellant's argument notwithstanding, how the jury deliberated, weighed the evidence and assessed the credibility of the witnesses, is known only to them and to God. Appellant's argument, that the short length of the deliberations and the return of a defense verdict is indicative of the jury being overburdened and manifesting a desire to not return the next business day for deliberations at the expense of a reasoned verdict, is base speculation and without merit based on the record provided. There was competent and credible evidence going to the material elements of the case upon which the jury could find in Macek's favor. C.E. Morris Co. v. Foley Constr. Co. (1978), 54 Ohio St.2d 279, 8 Ohio Op. 3d 261,376 N.E.2d 578, syllabus.
The seventh assignment of error is overruled.
It is ordered that appellee recover of appellant his costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
ANN DYKE, J., and TERRENCE O'DONNELL, J., CONCUR.
[1] Elias is a dentist.
[2] At that time, the building's first floor residential tenant was Richard Parsons. The second floor was occupied by Macek's residence.
[3] According to the witness, the photographic exhibits submitted by Elias, which depict the water-damaged condition of the basement and the flooring, were taken between March and April of 1998. Tr. 206-207, 209. However, the witness was positive that Macek was not living in the building at the time the photographs were taken. Tr. 212, 221.
[4] See Plaintiff's Exhibit 6 for a detailed account of the damaged items and their cost.
[5] In appellant's first assignment of error, she reproduces, in many instances not accurately transcribing the testimony or comments from the record, no fewer than fifty-five distinct passages culled from opening statements and examination of witnesses. In the second assignment, appellant cites to fourteen passages from the closing argument of defense counsel.
[6] These obvious typographical errors in the jury charge were corrected in the typewritten interrogatory given to the jury.